**PUEBLO WEST METROPOLITAN DISTRICT, City of Florence, and St. Charles Mesa Water Association, Appellants,**

v.

**SOUTHEASTERN COLORADO WATER CONSERVANCY DISTRICT, Appellee.**

No. 82SA225.

Supreme Court of Colorado, En Banc.

Oct. 22, 1984.

Robert F.T. Krassa, P.C., Robert F.T. Krassa, Pueblo, for appellants.

Fairfield & Woods, Charles J. Beise, Howard Holme, Kevin B. Pratt, Denver, for appellee.

QUINN, Justice.

The protestants, Pueblo West Metropolitan District, City of Florence, and St. Charles Mesa Water Association ("protestants"), appeal[1] orders of summary judgment entered against them by the Division No. 2 water court on their protest to the entry of partially absolute decrees for storage of water in Pueblo Reservoir and Turquoise Lake. We affirm the judgment.

## I.

For many years the Arkansas River and its tributaries constituted the principal source of water for the Arkansas River Valley in southeastern Colorado. In order to supplement this flow of water the United States Congress in 1962 authorized the Fryingpan-Arkansas Project (Project), a major transmountain water diversion project. The Project functions by diverting water from the Colorado River Basin on Colorado's western slope, across the Continental Divide, and into the Arkansas River Valley on Colorado's eastern slope. Water is diverted through the Boustead Tunnel, which crosses the Divide, into Lake Fork Creek, an Arkansas River tributary, and thence into Turquoise Lake, where it is stored until released downstream through a series of pipes and conduits into the Arkansas River and ultimately into Pueblo Reservoir. Southeastern, which administers the Project and is responsible for payment to the United States of the Project's reimbursable costs, holds several decrees for Project water. A brief summary of these decrees will help clarify the facts and issues before us.

Southeastern obtained its first decree for Project water in 1959 in Garfield County (hereafter, the "western slope decree").[2] This decree was for diversion of western slope water through the Boustead Tunnel to Sugar Loaf Reservoir (now Turquoise Lake) and ultimately to Pueblo Reservoir, and provided, in relevant part, as follows:

The Fryingpan-Arkansas Divide Tunnel conveys waters from the West side of the Continental Divide to the East side of the Continental Divide, and has a capacity of 900 cubic feet of water per second of time where the waters are discharged into the watershed of the Arkansas River. The headgates of the collection system[s] and the collection systems themselves represent claims aggregating 4,010 cubic feet of water per second of time, but the limitation on the diversion is the capacity of the Fryingpan-Arkansas Divide Tunnel of 900 cubic feet of water per second of time.

Waters diverted by said tunnel will be conveyed to and stored in Sugar Loaf Reservoir [now Turquoise Lake] and thence to Twin Lakes Reservoir, both thereof being in Lake County, and said reservoirs are existing reservoirs which will be enlarged. Thereafter, said waters will be conveyed by power canals and conduits to power generating facilities at various points along the Arkansas

---

1. This court has direct appellate jurisdiction of water court adjudications. *See* Colo. Const. art. VI, § 2(2), § 13–4–102(1)(d), 6 C.R.S. (1973) and C.A.R. 1(a)(2).

2. This decree was entered by the Garfield County District Court on August 3, 1959, in Civil Action No. 4613.

River terminating in the Pueblo Reservoir in Pueblo County.

In 1962 and 1969, Southeastern obtained conditional storage decrees for Pueblo Reservoir and Turquoise Lake respectively (hereafter, the "conditional storage decrees"). These decrees were issued by the district courts of Pueblo and Chaffee counties, both of which are on the eastern slope of the Continental Divide.[3] The two decrees each contain provisions regarding their respective sources of water. The 1962 decree for Pueblo Reservoir provides that its source of water is "the Arkansas River and drainage tributary thereto above the dam which creates the [Pueblo] Reservoir." Similarly, the 1969 decree for Turquoise Lake provides that its source of water is "Lake Fork of the Arkansas River and drainage tributary thereto above the dam which creates the [Turquoise Lake] Reservoir." Both conditional storage decrees also contain "exchange provisions" which, again, are very similar. The exchange provision in the 1962 conditional storage decree for Pueblo Reservoir states:

In addition to the priority hereinabove described, there is hereby decreed to the Pueblo Reservoir the right under priority of February 10, 1939, to take and store the waters of the Arkansas River so located as to be physically controllable by said Pueblo Reservoir in substitution for waters from the Colorado River tributaries decreed for storage in said Pueblo Reservoir and introduced into said Arkansas River.

Similarly, the 1969 decree for conditional storage rights for Turquoise Lake states:

In addition to the priority hereinabove described, there is hereby decreed to [Turquoise Lake] the right under priority of February 10, 1939, to take and store the waters from the Arkansas River so located as to be physically controllable by said [Turquoise Lake] in substitution for waters from the Colorado River trib-

utaries and decreed for storage in said [Turquoise Lake] and introduced into said Arkansas River.

In 1976, Southeastern filed an application to make absolute, to the extent of beneficial use, the conditional storage decrees of 1962 and 1969. Southeastern's application incorporated an attached "summary of activities," which stated in part:

Initial storage in ... Turquoise Lake started April 15, 1968. ... The maximum storage in the enlarged Turquoise Lake to date has been 104,927 acre-feet, which occurred on July 26, 1973. ...

\*       \*       \*       \*       \*       \*

Boustead Tunnel ... was completed in October 1971 .... Total diversions have been 32,070 acre-feet in 1972, 36,580 acre-feet in 1973, 33,830 acre-feet in 1974 and 37,060 acre-feet in 1975.

\*       \*       \*       \*       \*       \*

... Initial storage in [Pueblo] reservoir started January 9, 1974, and as of February 1, 1976, the total storage in the reservoir was 62,529 acre-feet .... Of the total storage of 62,529 acre-feet about 40,522 acre-feet was Project water and about 22,007 acre-feet was winter water ....

Southeastern alleged beneficial use to the extent of 62,529 acre feet in Pueblo Reservoir and 104,927 acre feet in Turquoise Lake. Pursuant to statutory procedure,[4] the water court included Southeastern's application in a resume, which was published in various newspapers of general circulation. The resume identified the conditional decrees by their names and case numbers and stated:

Applicant requests the entry of a final decree for the features hereinafter described ... to the extent the same have been used.

Pueblo Reservoir—62,529 acre-feet.

3. The 1962 decree was entered by the Pueblo County District Court on June 25, 1962, in Case No. 8757, and the 1969 decree by the Chaffee County District Court on July 19, 1969, in Civil Action No. 5141.

4. § 37-92-302, 15 C.R.S. (1973 & 1983 Supp.).

Turquoise Reservoir (Sugar Loaf)—104,-927 acre-feet.

In support of the application, there was attached a summary of activities of the United States Bureau of Reclamation, together with a statement showing the amount of money expended pursuant to said conditional decrees. (Said documents consist of five pages and may be examined at the office of the Clerk for Water Division No. 2[.])

Southeastern's application was subsequently granted on August 19, 1976.[5]

In January 1980, Southeastern made application in the water court for Water Division No. 2 for a change of water right by adding three new beneficial uses—flood control, recreation, and wildlife conservation—to the uses originally set forth in the 1962 and 1969 conditional storage decrees for Pueblo Reservoir and Turquoise Lake. Southeastern's application was granted on October 23, 1980.[6]

Finally, on August 27, 1980, Southeastern applied for additional partial absolute decrees for the conditional storage rights originally granted in 1962 and 1969, as modified by the 1980 change in water right decree. Southeastern's application referred to the 1962 and 1969 conditional storage decrees by name and case number. The application also named as sources of water for the requested absolute rights: "[w]ater diverted under the District's west-slope decrees"; "Sugar Loaf Reservoir [Turquoise Lake]—Lake Fork of Arkansas River"; and "Pueblo Reservoir—Arkansas River." Southeastern's request for additional partial absolute decrees, combined with the 1976 partial absolute decrees, totaled 104,025 acre feet for Pueblo Reservoir and 127,167 acre feet for Turquoise Lake. The protestants entered an appearance in this action but did not file a statement of opposition. In its ruling of June 26, 1981, the referee found that:

[n]o storage has occurred in Pueblo Reservoir under the Southeastern Colorado Water Conservancy District east slope conditional storage decrees, except for 5,645 acre-feet of flood storage, and that of the water stored, 68,617 acre-feet was water diverted under the Southeastern Colorado Water Conservancy District west slope decrees.

With respect to Turquoise Lake, the referee found that:

no storage has occurred in Turquoise Lake under the District's east slope conditional storage decrees, and that of the waters stored, 82,718 acre-feet was water diverted under the Southeastern Colorado Water Conservancy District's west slope decrees.

The water referee made absolute the Pueblo Reservoir decree to the extent of 41,496 acre feet beyond the 62,529 acre feet already absolutely decreed in 1976, for a total of 104,025 acre feet, which was the amount requested by Southeastern. The water referee's absolute decree for Pueblo Reservoir included 5,645 acre feet of flood storage. With regard to Turquoise Lake, the referee made absolute the conditional storage decree to the extent of 22,240 acre feet beyond the 104,927 acre feet absolutely decreed in 1976, for a total of 127,167 acre feet, again the amount requested by Southeastern.

Protestants on July 15, 1981, filed identical protests to the referee's rulings, arguing that the water court should deny Southeastern's application for partially absolute decrees. Protestants asserted that, with the exception of 5,645 acre feet of flood storage in Pueblo Reservoir, the only water stored by Southeastern in the two reservoirs was water diverted from the Colorado River under its 1959 western slope decree rather than water originating in the Arkansas River and its tributaries—the source named in Southeastern's applications for conditional storage decrees for Turquoise

---

**5.** The 1976 partial absolute decree was entered by the District Court for Water Division No. 2, Pueblo, Colorado, on October 1, 1976, in Case No. W-28 (76).

**6.** The decree was entered by the District Court for Water Division No. 2, Pueblo, Colorado, on October 23, 1980 in Case No. 80CW6.

Lake and Pueblo Reservoir. The protestants also argued that the 5,645 acre feet of flood storage could not be used as a basis for 'an absolute decree, since those flood waters were not put to "beneficial use" by Southeastern. The protestants also filed a counterclaim seeking to invalidate the absolute decree entered in 1976. They again argued that the water stored in Pueblo Reservoir and Turquoise Lake was water from the Colorado River diverted under Southeastern's 1959 western slope decree, and that Southeastern had thereby obtained an absolute right on the basis of water that came from a source other than that described in the notice accompanying the original conditional decrees of 1962 and 1969. According to protestants, this infirmity deprived the water court of jurisdiction to enter the partial absolute decree in favor of Southeastern in 1976.

Southeastern filed a motion for summary judgment of dismissal with regard to protestants' counterclaim, arguing that the 1976 decree which made absolute the conditional storage decrees for Pueblo Reservoir and Turquoise Lake to the extent of beneficial use was *res judicata*, and that the protestants were barred by the three-year statute of limitations, section 37–92–304(10), 15 C.R.S. (1973). The water court on February 1, 1982, granted Southeastern's motion and dismissed protestants' counterclaim. Southeastern also filed a motion for summary judgment as to the remainder of the protest, contending, *inter alia*, that the language of the 1962 Pueblo

Reservoir and 1969 Turquoise Lake conditional storage decrees was broad enough to include storage of western slope water in the two eastern slope reservoirs, and that flood control was a beneficial use sufficient to warrant the entry of an absolute decree to the extent of that use. The water court found that there was no genuine issue as to any material fact and entered summary judgment on April 16, 1982, in favor of Southeastern.

On appeal, the protestants initially claim that Southeastern's summary judgment motions were improvidently granted because a genuine issue of material fact exists, namely, whether the resumes prepared from Southeastern's applications for absolute decrees in the 1976 and 1980 proceedings gave adequate notice to interested persons of the nature of the water right sought.[7] Secondly, the protestants argue that entry of summary judgment in favor of Southeastern was improper since the discrepancy between the ultimate source of the water in the two reservoirs (the Colorado River) and the sources listed in the 1962 and 1969 conditional storage decrees (the Arkansas River and its tributaries) precludes the entry of a decree for an absolute water right as a matter of law. Finally, the protestants argue that flood control is not a "beneficial use" of water sufficient to warrant the entry of an absolute decree to the extent of that use. Before addressing these issues we first consider a threshold matter raised by Southeastern relating to

---

7. Protestants also assert that a genuine issue of material fact exists regarding the source of the water in Pueblo Reservoir and Turquoise Lake. As we discuss in Part IV, this assertion is based on their interpretation of the term "source" as used in the statute setting forth the requirements for an application to determine water rights. Simply put, protestants argue that Southeastern's absolute rights must be based on the same sources as its conditional rights; that the 1962 and 1969 conditional decrees name the Arkansas River and its tributaries as the sources of water in Pueblo Reservoir and Turquoise Lake, and Southeastern, therefore, must assert in its application for a partial absolute decree that the Arkansas and its tributaries are the sources of water for the two reservoirs; and that since the referee found that the Colorado

River is the source of the water stored in the two reservoirs, a genuine issue of material fact exists precluding the entry of summary judgment in favor of Southeastern.

This argument is utterly devoid of merit. Southeastern has never contested the referee's finding that the water stored in Pueblo Reservoir and Turquoise Lake came from the Colorado River; indeed, contrary to protestant's assertion, Southeastern's 1980 application for a partial absolute storage decree specifically lists water diverted under its west slope decree as a source of water. The real core of protestants' argument is that the water court erred *as a matter of law* in entering summary judgment in favor of Southeastern. We address this argument in Part IV of the opinion.

the protestants' counterclaim in which they sought to void the 1976 partial absolute decree.

## II.

Southeastern argues that the protestants' challenge by way of counterclaim to the 1976 partial absolute decree is barred by *res judicata* and the statute of limitations and, also, that a counterclaim is not procedurally permitted under the applicable provisions of the Water Right Determination and Administration Act of 1969, §§ 37–92–301 to –602, 15 C.R.S. (1973 & 1983 Supp.). Because we agree that the applicable statute of limitations bars the protestants' counterclaim, we need not consider whether a counterclaim is a permissible form of pleading in water court proceedings.

Section 37–92–304(10), 15 C.R.S. (1973), contains the statute of limitations for water right determinations. It provides:

Clerical mistakes in said judgment and decree may be corrected by the water judge on his own initiative or on the petition of any person, and substantive errors therein may be corrected by the water judge on the petition of any person whose rights have been adversely affected thereby and a showing satisfactory to the water judge that such person, due to mistake, inadvertence, or excusable neglect, failed to file a protest with the water clerk within the time specified in this section. Any petition referred to in the preceding sentence shall be filed with the water clerk within three years after the date of the entry of said judgment and decree. The water judge may order such notice of any such correction proceedings as he determines to be appropriate. Any order of the water judge making such corrections shall be subject to appellate review as in other civil actions.

Under this statute any substantive challenge to a judgment of a water right decree is barred unless filed within three years of entry of such judgment and decree and unless supported by a satisfactory showing of mistake, inadvertence, or excusable neglect. *Bubb v. Christensen,* 200 Colo. 21, 610 P.2d 1343 (1980). The protestants' counterclaim, which was filed on July 15, 1981, raises a substantive challenge to the 1976 partial absolute decree entered in favor of Southeastern and is clearly beyond the three-year statutory period of limitations. Thus, even if the protestants had made the requisite showing of mistake, inadvertence, or excusable neglect, which they did not, the counterclaim would still be untimely. To rule otherwise would frustrate the policies behind the statute of limitations. These policies include according certainty to adjudicated water rights and conserving scarce societal and judicial resources by requiring all parties adversely affected by a claim of a water right to assert opposition to the claim in a single proceeding.

## III.

We turn to the protestants' first challenge to the April 16, 1982, summary judgment order for partial absolute decrees for conditional storage rights entered in favor of Southeastern. In support of their claim that there exists a genuine issue of material fact which precludes the entry of summary judgment, protestants assert that a factual question exists as to whether Southeastern gave adequate notice to interested persons of those water rights which it sought to make absolute in its 1980 application for partial absolute storage decrees.

In resolving this issue we must be cognizant of the long-standing principles relating to summary judgments. Because summary judgment is a drastic remedy, it may properly be entered only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. C.R.C.P. 56; *Bailey v. Clausen,* 192 Colo. 297, 557 P.2d 1207 (1976); *O.C. Kinney, Inc. v. Paul Hardeman, Inc.,* 151 Colo. 571, 379 P.2d 628 (1963). The burden of establishing the lack of any genuine factual issue is on the moving party, but once this burden is met, the opposing party must then demonstrate that a controverted factual question exists.

C.R.C.P. 56(e); *Ginter, Jr. v. Palmer & Co.*, 196 Colo. 203, 585 P.2d 583 (1978); *Meyer v. Schwartz*, 638 P.2d 821 (Colo.App. 1981). If the party opposing summary judgment fails to meet this burden, then the court may properly enter summary judgment on behalf of the moving party as long as the operative legal principles entitle it to such judgment. *O.C. Kinney, Inc.*, 151 Colo. 571, 379 P.2d 628; *Bailey*, 192 Colo. 297, 557 P.2d 1207. The purpose of the summary judgment remedy, after all, is "to permit the parties to pierce the formal allegations of the pleadings and save the time and expense connected with a trial when, as a matter of law, based on undisputed facts, one party could not prevail." *Ginter, Jr.*, 196 Colo. 203, 585 P.2d 583; *see also Abrahamsen v. Mountain States Tele. & Tele. Co.*, 177 Colo. 422, 494 P.2d 1287 (1972); *Kinney*, 151 Colo. 571, 379 P.2d 628. It is in light of these guidelines that we must evaluate the protestants' claim.

■ Any person seeking a determination of a water right must file an application with the water clerk setting forth, *inter alia*, facts supporting the ruling sought, as well as a "legal description of the diversion or proposed diversion, a description of the source of the water, the date of the initiation of the appropriation or proposed appropriation, the amount of water claimed, and the use or proposed use of the water." § 37–92–302(1)(a) and (2), 15 C.R.S. (1973). The water clerk thereafter prepares a monthly resume of applications, noting the "name and address of the applicant, a description of the water right or conditional water right involved, and a description of the ruling sought." § 37–92–302(3)(a), 15 C.R.S. (1973). This resume must be published in local newspapers of general circulation and mailed to any person "the referee has reason to believe would be affected or who has requested the same by submitting his name and address to the water clerk." § 37–92–302(3)(c), 15 C.R.S. (1973).

It is this resume, compiled from the filed applications, which constitutes "notice" of the water right sought. *Stonewall Estates v. C.F. & I. Steel Corp.*, 197 Colo. 255, 592 P.2d 1318 (1979).

■ Contrary to the protestants' assertion, there is no "notice" problem with Southeastern's 1980 application, since both the application and resume indicated that it was the 1962 conditional storage decree for Pueblo Reservoir and the 1969 conditional storage decree for Turquoise Lake which Southeastern was seeking to make partially absolute.[8] As we later discuss in Part IV, *infra*, because the language of those conditional decrees was broad enough to encompass storage of western slope water in exchange for eastern slope water, the resume, which made reference to those decrees, was sufficient to put interested persons on notice of the absolute storage rights sought by Southeastern as to Turquoise Lake and Pueblo Reservoir. Accordingly, we hold that the protestants have not met their burden of establishing that a genuine issue of material fact exists on the notice issue.

■ We are not persuaded otherwise by *Stonewall Estates*, 197 Colo. 255, 592 P.2d 1318, relied upon by the protestants. *Stonewall Estates* involved an application for underground water rights. Although the caption of the application noted that the waters involved were nontributary, the application did not so indicate. The water clerk, in preparing and publishing the resume of the application, also did not indicate the nontributary character of the water. In holding that the partially absolute decree entered pursuant to the application and resume was void, the court said:

The published resume constitutes notice of a claim. Thus, our situation in Colorado is such that a holder of a decreed priority in an affected area can assume (absent actual notice or a state-

**8.** Although the record does not contain copies of the published resumes from the 1980 case, the referee found that the "Water Clerk caused publication of the application as provided by stat- ute," and the protestants have not contended that the published resumes did not make adequate reference to the two conditional decrees.

ment otherwise in the resume) that a claim to water is for tributary water. The resume here, not advising that non-tributary water was involved, suffered from such a defect that it was a nullity. 197 Colo. at 258–59, 592 P.2d at 1320. *Stonewall Estates* involved a serious omission of material information from the application and resume, whereas in the instant case neither the application nor the resume prepared from it was in any way misleading as to the nature of the conditional water storage rights sought to be made absolute. The protestants' reliance on *Stonewall Estates* is obviously misplaced.[9]

## IV.

We next consider protestants' argument that, even if there were no genuine issues of material fact, the water court erred in entering summary judgment in favor of Southeastern as a matter of law. In support of this argument they rely on section 37–92–302(2), 15 C.R.S. (1983 Supp.), which provides, *inter alia,* that "in the case of applications for a determination of a water right ... the forms shall require, among other things, ... *a description of the source of the water ...*" (emphasis added). Protestants interpret the word "source" as used in the statute or in a decree of a water right to refer to the water's point of origin or original source, as opposed to its point of procurement or immediate source.

The 1962 conditional storage decree for Pueblo Reservoir states that its source of water is "the Arkansas River and drainage tributary thereto above the dam which creates the [Pueblo] Reservoir." The 1969 conditional storage decree for Turquoise Lake states that its source is "Lake Fork of the Arkansas River and drainage tributary thereto above the dam which creates the [Turquoise Lake] Reservoir." Based on these descriptions and their interpretation of "source," the protestants conclude that Southeastern's absolute right to store water in the two reservoirs was improperly granted because the referee found that the stored water's point of origin was the Colorado River, rather than the Arkansas River and its tributaries, as named in the conditional decrees.

■ We need not decide whether the word "source" means "point of origin" or "point of procurement" in this context, since even assuming the protestants' interpretation is correct, their claim must fail. Although both the 1962 Pueblo Reservoir conditional storage decree and the 1969 Turquoise Lake conditional storage decree mention as their "source" of water the Arkansas River and its various tributaries, the protestants' focus on these descriptions is too narrow. The decrees must be read in their entirety. Both decrees contain "exchange" provisions that are broad enough to encompass the western slope water stored in the two reservoirs. The 1962 Pueblo Reservoir conditional storage decree grants to Southeastern the right to *"take and store the waters of the Arkansas River* so located as to be physically controllable by said Pueblo Reservoir *in substitution for waters from the Colorado River* tributary decreed for storage in said Pueblo Reservoir and introduced into said Arkansas River"* (emphasis added). It is clear that this substitution language encompasses the Project water at issue here, which, pursuant to Southeastern's 1959 western slope direct flow decree, passed

9. Protestants also argue that the publication method of providing notice, which was enacted in 1969, violates due process. Prior to the 1969 Act, § 148–9–7, 7 C.R.S. 1963, required notification by registered mail. Protestants assert that there "may" be owners of water rights who received notice by mail of the 1962 and 1969 conditional storage decrees who did not receive notice of the 1976 or 1980 applications for partial absolute decrees. We decline to address the protestants' argument for two reasons. First, they do not claim, nor is there any indication, that they did not receive actual notice of the 1976 proceeding, and it is clear that they did receive actual notice of the 1980 proceeding. Thus, the protestants have failed to show any injury from the allegedly defective notice that would accord them standing to raise on appeal the due process argument. *Miller v. Reeder,* 157 Colo. 134, 401 P.2d 604 (1965). Second, protestants failed to challenge the validity of the statutory publication notice in the water court, and they may not now attempt to raise it here. *See* § 37–92–304(9), 15 C.R.S. (1973).

through the Boustead Tunnel into an Arkansas tributary and ultimately into Pueblo Reservoir. Similarly, west slope Project water, which passed through the Boustead Tunnel and into Turquoise Lake, was encompassed by a virtually identical exchange provision in the Turquoise Lake decree. We conclude that the conditional storage decrees adequately and correctly describe as their sources the western slope Project water, the storage of which served as the basis upon which the 1982 summary judgment for absolute storage decrees was founded.

## V.

 The final issue is whether flood control is a "beneficial use" of water so as to justify the referee in granting Southeastern an absolute storage decree in Pueblo Reservoir to the extent of the 5,645 acre feet of Arkansas River flood waters captured and stored in that reservoir. We conclude that flood control does constitute a beneficial use.

Article XVI, section 6 of the Colorado Constitution provides that "[t]he right to divert the unappropriated waters of any natural stream to *beneficial uses* shall never be denied" (emphasis added). The Water Right Determination and Administration Act of 1969 (Act), §§ 37–92–101 to –602, 15 C.R.S. (1973 & 1983 Supp.), provides the statutory framework for implementing the constitutional right to divert the unappropriated waters of natural streams to beneficial uses. Under the Act, "beneficial use" is defined as "the use of that amount of water that is reasonable and appropriate under reasonably efficient practices *to accomplish without waste the purpose for which the appropriation is lawfully made ...*" § 37–92–103(4), 15 C.R.S. (1973) (emphasis added).

This court has recognized that the capture and storage of flood waters may be a "beneficial use" underlying an appropriation of water. *See R.J.A., Inc. v. Water Users Association of District No. 6,* — Colo. —, — P.2d — No. 83SA25, slip op. n. 7 (Colo. Sept. 10, 1984); *Southeast-ern Colorado Water Conservancy District v. Shelton Farms,* 187 Colo. 181, 529 P.2d 1321 (1974). Furthermore, we note that the Conservancy Law of Colorado specifically provides that conservancy districts may be established for the purpose of preventing floods, and, in order to effectuate that purpose, provides that conservancy districts may acquire, own, lease, use, sell, and hold water rights. §§ 37–2–101, 37–3–103(1)(h), 15 C.R.S. (1973). The legislature, we believe, would not have granted conservancy districts the right to acquire a water right for the purpose of preventing floods unless it considered flood prevention a beneficial use of water. We therefore conclude that the referee properly entered an absolute storage decree for Pueblo Reservoir to the extent of the 5,645 acre feet of flood waters stored there.

The judgment of the water court is affirmed.

