Jeris A. DANIELSON, State Engineer, and Ralph V. Kelling, Division Engineer, Water Division No. 4, Plaintiffs-Appellants,

v.

Ernest L. JONES, Defendant-Appellee.

No. 82SA400.

Supreme Court of Colorado, En Banc.

April 15, 1985.

Duane Woodard, Atty. Gen., Charles B. Howe, Deputy Atty. Gen., Joel W. Cantrick, Sol. Gen., David Aschkinasi, Wendy C. Weiss, Asst. Attys. Gen., Denver, for plaintiffs-appellants.

Brown and Brown, Bob Tweedell, A. Allen Brown, Delta, for defendant-appellee.

QUINN, Justice.

The state engineer and the division engineer[1] appeal a judgment entered by the water judge in water division no. 4, which granted the application of Ernest Jones for a determination of a water right to a well. The judgment awarded the Jones well an absolute right to divert tributary underground water at the rate of 27.5 gallons per minute for domestic, stock watering, irrigation, and fish culture purposes and also a storage right for fish culture. We reverse the judgment.

I.

On August 24, 1977, Jones filed with the state engineer an application for a permit to construct a well. *See* § 37–90–137, 15 C.R.S. (1973 & 1984 Supp.). Jones sought to pump fifteen gallons per minute (gpm) for domestic use and for the irrigation of one acre of land, with an average annual appropriation of 1.0 acre feet of water. The proposed well was to be located in Delta County near Surface Creek, a tributary of the Gunnison River. The state

---

1. For convenience we will refer in this opinion to both the state engineer and division engineer as the "state engineer."

engineer granted Jones a well permit with the specification that it was "for domestic use, including the irrigation of not over one acre of home gardens and lawns." Jones completed construction of his well on October 17, 1979.

On October 25, 1979, Jones, pursuant to the Water Right Determination and Administration Act of 1969 (the Water Right Act), §§ 37–92–101 to –602, 15 C.R.S. (1973 & 1984 Supp.), filed an application for determination of a water right in the district court for water division no. 4. Jones sought a decree for 60 gpm of water to be used for domestic, stock, and irrigation purposes for his 40 acre tract. The water clerk, pursuant to section 37–92–302(3), 15 C.R.S. (1973 & 1984 Supp.), included Jones' application in the resume of water right applications published in local newspapers. The published resume recited that Jones sought 60 gpm of water to be used for "domestic, stockwatering and irrigation purposes" with an appropriation date of October 17, 1979. No statements of opposition were filed to the application. The water referee ruled that because of the limitations of the permit issued by the state engineer, Jones was entitled to 15 gpm of water for domestic use only.

Jones filed a protest to the ruling of the water referee, objecting to the referee's limitation on both the amount and usage of water. He also filed another application with the state engineer for an increase in yield on his well permit, seeking 60 gpm of water, with an average annual appropria-

tion of 4.0 acre feet, for domestic and livestock purposes, for irrigating 25 acres of land, and for the additional purpose of "[f]ish ponds" to be used in the raising of trout. The state engineer on May 14, 1980, denied Jones' application for an increase in yield on his well permit, finding as follows:

That ground water produced by the proposed well will be hydraulically connected to and can influence the rate or direction of movement of water in the Youngs Creek, Kiser Creek, and Forked Tongue Creek system.

That due to the over-appropriated nature of the Youngs Creek, Kiser Creek, and Forked Tongue Creek system, the State Engineer cannot issue a non-exempt well [permit] in the proposed location at this time.

That the location of the proposed well will be at a distance less than six hundred feet from an existing well.

That the vested water rights of a senior appropriator diverting water from a well less than six hundred feet from the proposed subject well would be materially injured.

That the exercise of the requested permit will divert water from or tributary to the Youngs Creek, Kiser Creek, and Forked Tongue Creek system, and will therefore materially injure the vested water rights of others.

Jones did not appeal the state engineer's denial of his application for an increase in yield on his well permit.[2]

---

**2.** Section 37–90–115, 15 C.R.S. (1973), of the Colorado Ground Water Management Act, which section was in effect on May 14, 1980, when the state engineer denied Jones' application for an increase in yield on his well permit, authorized "[a]ny person dissatisfied with any decision, act, or refusal to act of the state engineer or the [ground water] commission under this article" to "take an appeal to the district court of the county wherein the water rights or wells involved are situated." Such administrative review of state engineer action with respect to well permits proceeded under section 24–4–106, 10 C.R.S. (1982), of the Administrative Procedure Act. *State of Colorado v. Southwestern Colorado Water Conservation District*, 671 P.2d 1294, 1315 n. 36 (Colo.1983). Effective June 10, 1983, section 37–90–115 was repealed and reen-

acted with amendments. Subsection 37–90–115(1) now authorizes an appeal by any party adversely affected "by a decision or act of the state engineer under section 37–90–110." Ch. 409, sec. 2, § 37–90–115, 1983 Colo.Sess.Laws 1416–17. Section 37–90–110 empowers the state engineer to require all flowing wells to be equipped with valves, to require wells to be constructed and maintained so as to prevent waste, to inspect wells, to order the cessation of well use pending correction of defects, to commence actions to enjoin the illegal opening or excavation of wells or withdrawal or use of water therefrom, and to take action to enforce compliance with regulations, controls, or orders of the ground water commission. *Southwestern Colorado Water Conservation District*, 671 P.2d at 1314–15 n. 33. As we discuss in note 9 *infra*,

Subsequent to the state engineer's denial of Jones' application for an increase in yield on his well permit, Jones on July 7, 1981, filed an amended protest to the water referee's ruling. Asserting that the capacity of his well had declined from its initial 60 gpm production to 27.5 gpm, Jones' amended protest stated that he was "hereby amend[ing] his application for water decree for his water well for 27.5 gpm for domestic, stock watering, irrigation and fish culture purposes." At no time was Jones' purported amendment to his application for determination of a water right included in the resume published by the water clerk in accordance with section 37–92–302(3) of the Water Right Act. After Jones filed his amended protest, the water judge entered an order re-referring the matter to the water referee. No statements of opposition having been filed, the referee issued an amended ruling on August 4, 1981, awarding an absolute decree to the Jones well "for an amount of water not to exceed 27.5 gpm for domestic, stock watering, irrigation and fish culture purposes, as of appropriation date October 17, 1979." The state engineer filed a protest to the ruling.

In the hearing before the water judge on the state engineer's protest, Jones described the general characteristics of the well, including its depth and capacity, and outlined the manner in which he used its 27.5 gpm yield for domestic, stock watering, irrigation and fish culture purposes. He testified that he raised fish in a series of three fish ponds which were supplied by a continuous flow from his well. The water flows directly from the well into the first pond, with the overflow being released to pasture land and diverted to the second pond by underground pipes equipped with valves to divide the diversion between several acres of pasture land, and then to a third pond. Jones' horses and cattle have access to all three of the ponds. The overflow from the third pond is transmitted to a large cistern and is used to irrigate his lawn and garden. Well water not used on Jones' land is diverted to a carrier ditch.

The state engineer presented testimony from the water commissioner in district 40 which indicated that the water diverted by the carrier ditch was transmitted away from the Youngs Creek, Kiser Creek, and Forked Tongue Creek stream system into another stream system principally comprised of Surface Creek. The water commissioner also testified that the Youngs Creek, Kiser Creek, and Forked Tongue Creek stream system is overappropriated and that holders of senior water rights have placed a call on Youngs Creek nearly every year during irrigation season, thereby requiring junior water rights on this creek to be shut down. A water resource engineer from the state engineer's office testified that, based on a geological study of the area in which Jones' well is located, the water-bearing formations supplying the well also contribute to the surface flow of Youngs Creek, Kiser Creek, and Forked Tongue Creek, and that diversion of water by the Jones well decreases the quantity of water available in the stream system by the amount of the diversion.

The water judge on May 10, 1982, awarded the Jones well an absolute decree for an amount of water not to exceed 27.5 gpm, "being .1225 acre feet of water in a period of 24 hours," for "domestic, stock watering, irrigation and fish culture purposes, with [the] right to store such water as may be necessary for such fish culture." [3] After noting that no one holding a senior water right had opposed Jones' ap-

the applicability of the 1983 version of section 37–90–115 to actions of the state engineer in granting or denying applications for well permits under section 37–90–137(2), 15 C.R.S. (1973), is an open question which we need not and do not resolve in this opinion.

3. The court in its decree awarded the Jones well an appropriation date of August 24, 1977, rather than October 17, 1979, the date on which the well was completed. Our disposition of this case renders it unnecessary to address the state engineer's claim, raised for the first time in oral argument, that the appropriation date in the decree is erroneous.

plication [4] and that the state engineer, who had initially granted Jones a well permit for 15 gpm, was presumably only contesting Jones' application for a decree to his well for an additional 12.5 gpm in excess of the 15 gpm, the court concluded that the 12.5 gpm was such an "infinites[i]mal quantity of water" that "[n]o possible adverse [e]ffect could be suffered by other appropriators from the allegedly affected stream system." This appeal followed.

## II.

■■■■ The state engineer claims that the water court's decree is void because it grants Jones the right to use water for fish cultivation and a concomitant storage right and, since Jones did not include fish culture and storage in his original application for a water right, notice of such intended uses was never published in the resume as required by section 37–92–302(3), 15 C.R.S. (1973 & 1984 Supp.). A review of the applicable provisions of the Water Right Act, which governs the priority system of appropriation of surface and underground tributary water except water included in the definition of designated ground water, *see generally State ex rel. Danielson v. Vickroy*, 627 P.2d 752 (Colo.1981), leads us to conclude that Jones' failure to include fish culture and a concomitant storage right in the application which formed the basis of the published resume nullified

these parts of the decree authorizing the use of 27.5 gpm for these two purposes.[5]

■■■ The Water Right Act provides the sole method for determining a water right to underground tributary water, and its provisions must be adhered to in seeking a judgment and decree pertaining to a water matter. *See, e.g., Fort Lyon Canal Co. v. Catlin Canal Co.*, 642 P.2d 501 (Colo.1982); *Gardner v. Enewold*, 200 Colo. 221, 614 P.2d 357 (1980). As a consequence, a water judge may only consider those water matters that are presented in a proper application and in a manner that provides appropriate notice to potential objectors. *See, e.g., United States v. City and County of Denver*, 656 P.2d 1 (Colo.1982); *Town of Breckenridge v. City and County of Denver*, 620 P.2d 1048 (Colo.1980); *Orchard City Irrigation District v. Whitten*, 146 Colo. 127, 361 P.2d 130 (1961). A person seeking a decree for the right to divert underground tributary water by means of a well must file an application with the water clerk setting forth facts to support the ruling sought, including "a legal description of the diversion or proposed diversion, a description of the source of the water, the date of the initiation of the appropriation or proposed appropriation, the amount of water claimed, and the use or proposed use of the water." § 37–92–302(1)(a) and (2), 15 C.R.S. (1984 Supp.). The water clerk is required to prepare a

---

4. The failure of senior water users to oppose Jones' application is of no significance. Water users are entitled to rely on the state engineer's duty to protect the priority system and not "to allow ground water withdrawal which would deprive senior surface rights of the amount of water to which said surface rights would have been entitled in the absence of such ground water withdrawal." § 37–92–501(1), 15 C.R.S. (1973). The state engineer is obviously a proper party with requisite standing to file a statement of opposition to an application for a determination of a water right and, as here, to file a protest to a ruling of the water referee. *E.g., Wadsworth v. Kuiper*, 193 Colo. 95, 562 P.2d 1114 (1977).

5. Jones argues that the decree adjudicating him a water right for fish cultivation and an accompanying storage right is not void because, in his view, the failure of the state engineer to object

to Jones' testimony concerning his use of water for fish ponds resulted in the issue of fish cultivation being tried by consent. *See* C.R.C.P. 15(b). We reject this reasoning. The rules of civil procedure apply to proceedings under the Water Right Act only insofar as they are consistent with provisions of the Act. *Gardner v. Enewold*, 200 Colo. 221, 614 P.2d 357 (1980); C.R. C.P. 81(a). Given the necessity of adherence to the Water Right Act's notice requirements, the parties could not confer upon the water court the authority to decree a water right for fish culture and storage uses in this manner. *Stonewall Estates v. CF & I Steel*, 197 Colo. 255, 259, 592 P.2d 1318, 1320 (1979). For similar reasons, Jones' noncompliance with the notice provisions regarding his proposed uses of water is not obviated by the fact that the decree granted him less water than he requested in his original application.

monthly resume of applications, which includes the "name and address of the applicant, a description of the water right or conditional water right involved, and a description of the ruling sought." § 37–92–302(3)(a), 15 C.R.S. (1984 Supp.). This resume must be published in local newspapers of general circulation and mailed to any person whom the referee has reason to believe would be affected by the water right or who has requested such notice. § 37–92–302(3)(c), 15 C.R.S. (1984 Supp.). The resume thus published or mailed constitutes "notice" of the water right decree sought by the applicant. *Pueblo West Metropolitan District v. Southeastern Colorado Water Conservancy District*, 689 P.2d 594 (Colo.1984); *Stonewall Estates v. CF & I Steel Co.*, 197 Colo. 255, 592 P.2d 1318 (1979).

■ Because the judicial determination of a water right may potentially affect the vested rights of others utilizing the same source of water, compliance with the statutory notice provisions is essential to provide a meaningful opportunity to those who might be injuriously affected by the decree to oppose the application. *See, e.g., City and County of Denver*, 656 P.2d 1; *Broyles v. Fort Lyon Canal Co.*, 638 P.2d 244 (Colo.1981); *Town of Breckenridge*, 620 P.2d 1048; *Stonewall Estates*, 197 Colo. 255, 592 P.2d 1318. The importance of compliance with the statutory notice provisions concerning the applicant's proposed uses of water is obvious. The consumptive use of water—that is, the amount of water which does not return to the stream system after use—varies with the purpose for which the water is used. *See Danielson v. Kerbs Ag., Inc.*, 646 P.2d 363 (Colo.1982); *Ackerman v. Walsenburg*, 171 Colo. 304, 467 P.2d 267 (1970); *Green v. Chaffee Ditch Co.*, 150 Colo. 91, 371 P.2d 775 (1962). For this reason, a party seeking a change of water right, which is defined as including "a change in the type, place, or time of use," § 37–92–103(5), 15 C.R.S. (1973), must file an application with the water court providing "a complete statement of such change." § 37–92–302(2), 15 C.R.S. (1984 Supp.). Such application for a

determination with respect to a change of a water right is subject to the same resume publication requirements as an application for a water right in the first instance. § 37–92–302(3), 15 C.R.S. (1973 & 1984 Supp.). A decree for a change of a water right may be granted only if it "will not injuriously affect the owner of or persons entitled to use water under a vested water right or a decreed conditional water right." § 37–92–305(3), 15 C.R.S. (1973).

In view of the significant interests which the statutory notice provisions of the Water Right Act are intended to safeguard, Jones' failure to comply with these notice provisions in this case renders that part of the decree authorizing the use of the water awarded to the Jones well for fish culture and storage purposes subject to the same type of infirmity as was present in *Stonewall Estates*, 197 Colo. 255, 592 P.2d 1318. In that case the applicant for underground water rights for five wells failed to state in the body of the application that the subject waters were nontributary, with the result that the published resume similarly failed to mention the nontributary character of the waters. There having been no statements of opposition filed, the referee found that the five wells appropriated nontributary water and awarded absolute and conditional rights to the wells for various purposes. Although the water court initially entered a decree based on the referee's ruling, at a later proceeding brought by the applicant to make the conditional decree absolute the water court vacated the decree, ruling that it lacked jurisdiction to enter the original decree because proper notice of the nontributary character of the water was not given to those who might have been affected by the decree. In affirming the water court's vacation of the decree, this court stated:

The published resume constitutes notice of a claim. Thus, our situation in Colorado is such that a holder of a decreed priority in an affected area can assume (absent actual notice or a statement otherwise in the resume) that a claim to water is for tributary water. The re-

sume here, not advising that non-tributary [water] was involved, suffered from such a defect that it was a nullity. *See Empire Ranch v. Coldren,* 51 Colo. 115, 117 P. 1005 (1911). Section 37–92–302(3)(a), C.R.S.1973 provides that "The resume shall give ... a *description of the water right* or conditional water right involved...." (Emphasis added.) Since the resume did not mention the non-tributary character of the water right, it did not substantially comply with this provision of the statute.

\*　　\*　　\*　　\*　　\*　　\*

The 1973 decree ... was entered without jurisdiction and was *void.* It is not subject to any statute of limitation. As stated in *West End Irrigation Co. v. Garvey,* 117 Colo. 109, 184 P.2d 476 [ (1947) ], "to the extent a decree is beyond the authority of the court, it cannot be made valid by any rule of res judicata or any statutes of limitation."

197 Colo. at 258–59, 592 P.2d at 1320.[6]

In this case, Jones' original application, which was incorporated into the published resume, sought a determination of a water right for 60 gpm of water for domestic, stock, and irrigation purposes. In his amended protest to the original ruling of the water referee, which awarded Jones' well an absolute decree for an amount of water not to exceed 15 gpm for domestic purposes only, Jones stated that he was amending his application for determination of a water right by now requesting a water right decree for 27.5 gpm for domestic, stock watering, irrigation, and, as critical here, "fish culture" purposes. The water judge entered a decree awarding the Jones well 27.5 gpm not only for domestic, stock watering, and irrigation purposes, but also for "fish culture," a purpose never included in Jones' original application or in the published resume. Furthermore, the decree included a right "to store such water as may be necessary for such fish culture." Once again, however, Jones' original application contained no request for a storage right, and the published resume based on that application merely indicated that Jones was seeking an adjudication of a right to divert water for domestic, stock watering, and irrigation purposes. As in *Stonewall Estates,* 197 Colo. 255, 592 P.2d 1318, the failure of Jones' original application and the published resume based thereon to provide potential objectors with any notice of the fish culture and storage uses ultimately included in the decree resulted in a lack of substantial compliance with the notice provisions of the Water Right Act and vitiated those provisions of the decree that authorized the use of 27.5 gpm for fish culture and storage purposes.

### III.

We are left to consider whether, notwithstanding the void provisions of the decree,

---

**6.** In *Stonewall Estates,* the water court also ruled that it had jurisdiction over nontributary ground water outside a designated groundwater basin. No appeal, however, was taken from that part of the court's ruling. Thus, the only issue which this court considered in that case was whether a water judge could enter a valid decree for a water right when there was not substantial compliance with the resume notice provisions of section 37–92–302(3) of the Water Right Act. Our holding that such a decree was void necessarily assumed that the decree pertained to a water matter over which the court had subject matter jurisdiction in the first instance. Subsequent to our decision in *Stonewall Estates,* this court in *State of Colorado v. Southwestern Colorado Water Conservation District,* 671 P.2d 1294, 1311 (Colo.1983), held that "claims for nontributary ground water outside designated ground water basins cannot be adjudicated under the 1969 Act." After *Southwest-* *ern Colorado Water Conservation District* was announced, the General Assembly enacted Senate Bill 439, which expanded the definition of "water matters" in section 37–92–203(1) to include "determinations of rights to nontributary ground water outside of designated ground water basins." Ch. 516, sec. 1, § 37–92–203(1), 1983 Colo.Sess.Laws 2079. These subsequent jurisdictional developments do not affect our holding in *Stonewall Estates* concerning the necessity of complying with the resume notice requirements in connection with a "water matter." There is no dispute in the instant case that Jones' request for a right to use 27.5 gpm for the purpose of "fish culture," made for the first time in his protest to the water referee's ruling, and the water judge's decree for both fish culture and storage purposes are clearly "water matters" within the intendment of the Water Right Act.

we should affirm that part of the decree which awarded the Jones well an absolute right to divert 27.5 gpm for domestic, stock watering, and irrigation purposes.[7] The validity of this part of the decree depends on whether there is adequate support in the record for the water judge's determination that the water right of 27.5 gpm decreed to the Jones well for domestic, stock watering, and irrigation purposes would not adversely affect the senior water rights of others. We conclude that the evidence, when viewed in light of pertinent provisions of the Colorado Ground Water Management Act, §§ 37–90–101 to –141, 15 C.R.S. (1973 & 1984 Supp.), and the Water Right Act, §§ 37–92–101 to –602, 15 C.R.S. (1973 & 1984 Supp.), is inadequate to support any part of the decree. Before considering the evidence, we briefly review the relevant statutory scheme.

## A.

Section 37–92–102(1)(a), 15 C.R.S. (1984 Supp.), states:

It is hereby declared to be the policy of the state of Colorado that all water[s] in or tributary to natural surface streams originating in or flowing into this state have always been and are hereby declared to be the property of the public, dedicated to the use of the people of the state, subject to appropriation and use in accordance with sections 5 and 6 of article XVI of the state constitution and this article. As incident thereto, it is the policy of this state to integrate the appropriation, use, and administration of underground water tributary to a stream with the use of surface water in such a way as to maximize the beneficial use of all the waters of this state.

The legislature has delegated to the state engineer the responsibility for the administration and distribution of the waters of the state. § 37–92–501(1), 15 C.R.S. (1973). Since section 37–92–103(13), 15 C.R.S. (1973), defines "waters of the state" to mean "all surface and underground water in or tributary to all natural streams within the state of Colorado, except [designated ground water] referred to in section 37–90–103(6)," [8] the responsibility of the state engineer necessarily includes integrating the administration of surface and underground tributary water. Section 37–92–501(1), 15 C.R.S. (1973), expresses the legislative intent in regard to this latter responsibility of the state engineer:

It is the legislative intent that the operation of this section shall not be used to allow ground water withdrawal which would deprive senior surface rights of the amount of water to which said surface rights would have been entitled in the absence of such ground water withdrawal, and that ground water diversions

---

7. Section 37–92–602(1)(b), 15 C.R.S. (1973), exempts from administration within the priority system wells drawing not more than 15 gpm for ordinary household purposes, watering of domestic animals and livestock, and irrigation of not over one acre of home gardens and lawns. The balance of the decree here under consideration includes a water right to divert 27.5 gpm of water to irrigate 40 acres, an area far in excess of the one acre of "home gardens and lawns" exempted from administration by section 37–92–602(1)(b). Moreover, the portions of the decree exclusive of the fish culture purpose and the accompanying storage right are not within the statutory rebuttable presumption of noninjury to the vested water rights of others or to any other existing well. Section 37–92–602(3)(b)(II), 15 C.R.S. (1973), as pertinent here, limits the rebuttable presumption of nonmaterial injury to wells which will be used solely for the purposes specified in section 37–92–602(1)(b).

8. Section 37–90–103(6), 15 C.R.S. (1984 Supp.), defines designated ground water as follows:

"Designated ground water" means that ground water which in its natural course would not be available to and required for the fulfillment of decreed surface rights, or ground water in areas not adjacent to a continuously flowing natural stream wherein ground water withdrawals have constituted the principal water usage for at least fifteen years preceding the date of the first hearing on the proposed designation of the basin, and which in both cases is within the geographic boundaries of a designated ground water basin. "Designated ground water" shall not include any ground water within the Dawson-Arkose, Denver, Arapahoe, or Laramie-Fox Hills formation located outside the boundaries of any designated ground water basin that was in existence on January 1, 1983.

shall not be curtailed nor required to replace water withdrawn, for the benefit of surface right priorities, even though such surface right priorities be senior in priority date, when, assuming the absence of ground water withdrawal by junior priorities, water would not have been available for diversion by such surface right[s] under the priority system.

Section 37–90–137(2), 15 C.R.S. (1973), of the Colorado Ground Water Management Act requires the state engineer, upon receipt of a permit application for a well outside the boundaries of a designated ground water basin, to "make a determination as to whether or not the exercise of the requested permit will materially injure the vested water rights of others." This section then states:

> If the state engineer finds that there is unappropriated water available for withdrawal by the proposed well and that the vested water rights of others will not be materially injured, and can be substantiated by hydrological and geological facts, he shall issue a permit to construct a well, but not otherwise; except that no permit shall be issued unless the location of the proposed well will be at a distance of more than six hundred feet from an existing well, but if the state engineer, after a hearing, finds that circumstances in a particular instance so warrant, he may issue a permit without regard to the above limitation.

Section 37–92–302(2), of the Water Right Act requires a person seeking an adjudicated right to divert water by means of a well to file an application with the water clerk, which application must be supplemented by a well permit or evidence of its denial by the state engineer or evidence of the state engineer's failure to act within six months after the application was made. The use which the water judge is to make of the state engineer's findings in evaluating a water right application involving a well is set out in section 37–92–305(6), 15 C.R.S. (1973):

> In the case of an application for determination of a water right or a conditional water right ... which requires construction of a well, the referee or the water judge, as the case may be, shall consider the findings of the state engineer, made pursuant to section 37–90–137, which granted or denied the well permit, and may grant a conditional decree unless a denial of such permit was justified under said section, and in case a final decree or conditional decree is granted by the court, the state engineer shall issue said permit.

*See Broyles,* 638 P.2d at 249. The applicant seeking a determination of a water right bears the burden of sustaining the application. § 37–92–304(3), 15 C.R.S. (1984 Supp.).

 In view of the obvious interrelationship between the state engineer's responsibility in granting or denying well permits, § 37–90–137(2), 15 C.R.S. (1973), the water court's responsibility in adjudicating a water right involving the use of a well, § 37–92–305(6), 15 C.R.S. (1973), and the statutory burden of proof in water right applications, § 37–92–304(3), 15 C.R.S. (1984 Supp.), we are satisfied that where, as here, the well permit applicant has not appealed the state engineer's denial of the well permit application pursuant to section 37–90–115, 15 C.R.S. (1973), *see State of Colorado v. Southwestern Colorado Water Conservation District,* 671 P.2d 1294, 1314–15 (Colo.1983),[9] the legislature intended (1) that a water judge, in adjudicating a

**9.** *See supra* note 2. In *State of Colorado v. Southwestern Colorado Water Conservation District,* 671 P.2d 1294, 1315–16 n. 36 (Colo.1983), we took note of the tension between the statutory function of the water judge in adjudicating an application for a water right involving the construction of a well and the pre-1983 version of section 37–90–115, 15 C.R.S. (1973), relating to an appeal to the district court of the state engineer's decision on a well permit application, but we declined to express an opinion on how the tension might be resolved. In the instant case Jones did not appeal the state engineer's denial of his application for an increase in yield on his well permit. It is therefore unnecessary for us to determine at this time whether and to what extent a judgment entered pursuant to section 37–90–115, 15 C.R.S. (1973), should be binding on a water judge in connection with an adjudication of a water right involving the same tributary water well as was the subject of the

water right involving the use of a well, should accept as presumptively valid the state engineer's findings on material injury, and (2) that when the state engineer has made a finding of material injury to senior water rights, the applicant for an adjudicated water right should bear the burden of proving that the water right sought would not cause such material injury. This construction not only recognizes the statutory role delegated to the state engineer in the administration of water resources but also permits the water court to make optimum use of the "special expertise of the state engineer with respect to wells and their effect on other water users." *Broyles*, 638 P.2d at 250. When the findings of the state engineer do not give rise to a presumption of material injury, the statutory scheme contemplates that a party opposing the application should bear the burden of proving material injury to senior water rights. A prima facie case of material injury is established under such circumstances when sufficient evidence is presented to the water judge to support a finding by a preponderance of evidence that material injury will be caused to senior appropriators generally, rather than to a particular senior user. *Hall v. Kuiper*, 181 Colo. 130, 510 P.2d 329 (1973); *Fellhauer v. People*, 167 Colo. 320, 447 P.2d 986 (1968). If a prima facie case of material injury is so established, the applicant bears the burden of ultimately proving by a preponderance of evidence that the decreed water right will cause no material injury to senior water rights.

With this statutory scheme as our frame of reference, we turn to the evidence underlying the decree.

### B.

██ The water judge made the following findings and conclusions on material injury:

[W]e are here concerned only with the additional yield of 12½ g.p.m. sought by applicant. This would amount to .0275 cfs or .055 acre feet of water per day, an infinites[i]mal quantity of water. No possible adverse [e]ffect could be suffered by other appropriators from the allegedly affected stream system. The alleged injury to senior water rights is more theoretical than real.

These findings and conclusions concerning the absence of any adverse effect on senior water rights are without support in the evidence.

It is true that the state engineer's findings on material injury were based on Jones' permit application for 60 gpm, rather than 27.5 gpm as Jones ultimately requested in his amended application for a determination of a water right, and, under these circumstances, the state engineer's findings do not rise to the level of a presumption that a decree to the Jones well for 27.5 gpm would cause material injury to senior water rights. This is not to say, however, that the findings of the state engineer were of no evidentiary value whatever to the issue of material injury as implicated in Jones' application for a water right decree. The state engineer's findings make abundantly clear the following: that the Jones well is hydraulically connected to the Youngs Creek, Kiser Creek, and Forked Tongue Creek stream system, which was already overappropriated; that the vested rights of senior appropriators diverting water from this stream system would be materially injured by Jones' exercise of the requested increase in yield on his well permit; that the Jones well was located within 600 feet of an existing well; and that the vested water rights of a senior appropriator diverting from this other well would be materially injured. These findings, although not presumptive evidence of material injury, are nevertheless sugges-

statutory appeal pursuant to section 37–90–115, 15 C.R.S. (1973). Because, however, the state engineer did make findings on material injury in connection with Jones' application for an increase in yield on his well permit and because the state engineer's decision was not appealed pursuant to section 37–90–115, 15 C.R.S. (1973),

we are necessarily confronted with the question of the effect of these findings of the state engineer on the water judge's adjudication of Jones' application for determination of a water right involving the same tributary water well as was the subject of the state engineer's findings.

tive of the inference that an increase in production from 15 gpm to 27.5 gpm on the Jones well would adversely affect the senior water rights of others in the area, although admittedly to a lesser degree than would be caused by an increase to 60 gpm.

More important to the analysis here is the state engineer's trial evidence that directly bore on the issue of material injury. The testimony of the state engineer's witnesses established that the stream system to which the Jones well was hydrologically connected was already overappropriated and that the hydrological connection between the Jones well and the overappropriated surface streams was such that water diverted by the well would diminish to a corresponding amount the quantity of water available in the stream system. This evidence bearing on the issue of material injury was unrebutted.

Contrary to the court's ruling, the quantity of water involved here cannot be characterized as "infinitesimal." The calculations contained in the decree indicate that the incremental difference between 15 gpm, the amount of water awarded in Jones' original well permit, and 27.5 gpm, the amount of water ultimately decreed to Jones' well, would translate, if pumped continuously, into .055 acre feet per day and 20 acre feet per year. This quantity of water cannot be considered legally insignificant to the ability of an already overappropriated stream system to satisfy senior decrees. The determination by the water judge that "[n]o possible adverse [e]ffect could be suffered by other appropriators from the allegedly affected stream system" gives no consideration whatever to the ef-

fect of the additional yield of 12.5 gpm on senior water rights.

Under the evidentiary posture of this case, it was Jones' burden to controvert the state engineer's evidence of material injury by presenting evidence which would reasonably support a finding by the water judge that a water right for 27.5 gpm decreed to the Jones well would not cause material injury to senior water rights. Jones failed to present any such evidence. In the absence of such evidence, we cannot affirm that part of the decree awarding the Jones well an absolute right to divert 27.5 gpm for domestic, stock watering, and irrigation purposes.[10]

The judgment is reversed.

---

**10.** Nor, under the record before us, would it be appropriate to remand the case to the water court for the entry of a decree for the 15 gpm that Jones requested in his original well permit application approved by the state engineer. Jones' well permit application represented that the 15 gpm yield would not exceed an annual appropriation of 4.0 acre feet and would be limited to domestic purposes including the use of 1.0 acre feet of water for the irrigation of his lawn and garden. In his amended water right application, which served as the basis for the water right decreed by the court, Jones requested a decree for 27.5 gpm. This 27.5 gpm, when pumped continuously, computes out to 44.36

acre feet per year, a substantially greater amount of water than the 4.0 acre feet included in Jones' original well permit application. Furthermore, Jones also requested and the court decreed a water right to use the 27.5 gpm for the purpose of irrigating his entire 40 acre tract, as distinguished from the irrigation of his one acre tract of home lawn and garden authorized under the original well permit. The water right decreed to the Jones well, therefore, included an annual appropriation and use neither considered nor approved by the state engineer in connection with Jones' original well permit application.