No. 24207.

L. O. FUNDINGSLAND *v.* THE COLORADO GROUND WATER COMMISSION.
(468 P.2d 835)

Decided May 4, 1970.     Rehearing denied June 1, 1970.

RAPHAEL J. MOSES, for plaintiff in error.

DUKE W. DUNBAR, Attorney General, JOHN P. MOORE,

Deputy, JAMES D. GEISSINGER, Assistant, BEN L. WRIGHT, Special Assistant.

*En Banc.*

MR. JUSTICE PRINGLE delivered the opinion of the Court.

ON September 2, 1966, Mr. Fundingsland (hereinafter referred to as the plaintiff) filed an application with the Colorado Ground Water Commission (hereinafter referred to as the commission) for a permit to drill a well on certain property located in the Northern High Plains Designated Ground Water Basin in Kit Carson County. No objections to the application were filed. On February 27, 1967, the plaintiff's application was denied by the commission on the basis that there was overappropriation in the area where the well was to be drilled. The plaintiff objected to the ruling of the commission, and a hearing was held before the commission on December 12, 1967. As the result of the hearing the commission sustained its previous denial of the plaintiff's application. The commission's order was subsequently withdrawn on the basis that there was new information to be considered by the commission. This information was presented to the commission on March 19 and 20, 1968, and on May 15, 1968 the commission published an order denying the plaintiff's application.

The plaintiff appealed the decision of the commission to the district court, and a trial de novo was held with expert testimony being presented by both the plaintiff and the commission. The record of the testimony given before the commission during the December 12th hearing was made a part of the evidence, as specifically provided for by statute. The trial judge entered a judgment denying the plaintiff's application, and the plaintiff brings writ of error to this Court from that judgment. Plaintiff makes it very clear that he does not in any way contest the constitutionality of the Ground Water Act under which

this proceeding was conducted. He alleges as grounds for reversal (1) that the denial of his application was not supported by the evidence and was arbitrary and capricious; (2) that denial of the application deprives the plaintiff of his constitutional right to appropriate; and (3) that the rule upon which the commission relied was adopted in violation of the provisions of the Administrative Code and cannot be enforced. This Court finds no error, and we affirm the judgment of the district court.

I.

The court and the commission derive their authority to pass on the plaintiff's application from 1965 Perm. Supp., C.R.S. 1963, 148-18-1 *et seq.* (formerly Senate Bill 367) which deals with captive ground water. Under 148-18-6 the commission is empowered to deny an application if it finds that the proposed appropriation will unreasonably impair existing water rights from the same source, or will create unreasonable waste. The act further provides in 148-18-6(5):

"In ascertaining whether a proposed use will create unreasonable waste or unreasonably affect the rights of other appropriators, the commission shall take into consideration the area, and geologic conditions, the average annual yield and recharge rate of the appropriate water supply, the priority and quantity of existing claims of all persons to use the water, the proposed method of use, and all other matters appropriate to such questions. With regard to whether a proposed use will impair uses under existing water rights, impairment shall include the unreasonable lowering of the water level, or the unreasonable deterioration of water quality, beyond reasonable economic limits of withdrawal or use."

Upon trial de novo, as provided in the statute, the trial court made detailed findings of fact concerning the proper tests to be used in determining whether the proposed use of water by the plaintiff would unreasonably impair existing water rights from the same source or create unreasonable waste. And after making those

findings, the court determined that they supported a denial of the plaintiff's application.

Among these findings, the Trial court determined that a so-called three mile test provided a reasonable basis for assessing the effect of a proposed use on other users in the district. The three mile test was developed for use in the Northern High Plains. It is partly based on policy and partly based on fact and theory. Using that test, a circle with a three mile radius is drawn around the proposed well site. A rate of pumping is determined which would result in a 40% depletion of the available ground water in that area over a period of 25 years. If that rate of pumping is being exceeded by the existing wells within the circle, then the application for a permit to drill a new well may be denied.

The three mile test takes into account all of the considerations specified in the statute. The factors involved in the three mile test were explained to the court by Mr. Erker, senior engineer in the ground water section of the State Engineer's office. He testified that the three mile circle represents the area over which a well, located at the center, would have an effect if permitted to pump intermittently for 25 years. Intermittent pumping, he explained, meant approximately 100 days per year. Other factors which are considered are the saturated thickness of the aquifer within the three mile circle, the number of wells located within the circle, and the yield of those wells. Multiplying the number of wells within the circle times the yield of those wells gives the total, present appropriation within the three mile circle.

Mr. Romero, an assistant water resource engineer for the State of Colorado Division of Water Resources, testified that the modified Theiss equation was used in determining what the draw down effect on the water in the aquifer would be within the three mile circle. He further testified that in determining the balance of water in the aquifer, he considered the fact that there was only intermittent pumping, the amount of recharge to the

aquifer due to precipitation and ground water inflow from outlying areas, recharge due to excess irrigation, and possibly recharge from some other source such as leakage from ditches or rivers.

There does not seem to be any contention that the 40% depletion figure is unreasonable or irrational. The assumption in the three mile test is that a 40% depletion of the aquifer within that area would constitute lowering of the water balance beyond reasonable economic limits of withdrawal or use for irrigation.

Likewise, the selection of 25 years as the period during which the 40% depletion is to be allowed is not contested. Mr. Leslie, a farm and ranch loan representative for Northwestern Mutual Life Insurance Company, testified that 25 years was a reasonable, average period in which a loan for the construction of well facilities would have to be repaid.

The testimony and other evidence in the record before the district court support the reasonableness of the three mile test and establish that the three mile test takes into account the factors specified by the statute. If the three mile test was a proper method for the court to use in determining the effect of plaintiff's proposed use on the ground water supply in the district, then the decision of the district court must be upheld.

The plaintiff argues that the three mile test is based on certain assumptions which are not present in this case, and that the failure of the court to take into account variations from the conditions assumed in the Theiss equation renders the decision of the court arbitrary and contrary to the evidence.

In developing the three mile test, the commission's staff assumed that the aquifer was homogeneous, isotropic, and level. The staff used 150 feet as the saturated thickness of the aquifer in the three mile area surrounding the plaintiff's proposed well site.

Both in the hearing before the commission and in the de novo trial before the district court, the plaintiff pre-

sented testimony by Mr. Owens, an engineering geologist and ground water hydrologist. Mr. Owens is familiar with the data available on the Northern High Plains Designated Ground Water Basin, and he testified that the saturated sand and gravel was not homogeneous as assumed in the equation but was interspersed with layers of clay and other less permeable deposits. Mr. Owens further pointed out that the aquifer is not isotropic, and that a semi-artesian condition exists in most of the Ogallala aquifer which, he said, would exaggerate the draw down due to initial pumping. Furthermore, Mr. Owens testified that most of the saturated sand and gravel is at the bottom of the aquifer and that early draw down rates would not represent the same depletion of the water available in the aquifer as would be represented by similar draw down in a homogeneous aquifer. It was further brought out that the aquifer slopes to the northeast, and that the plaintiff's proposed well would have a greater effect on down slope wells than it would on those upslope within the three mile circle. Finally, Mr. Owens testified that test well readings taken some distance from the site for the proposed well indicate that the water supply in the whole ground water basin is declining at a slower rate than anticipated by the three mile test.

We do not find that the evidence introduced by the plaintiff's expert is so conclusive in its effect that we can say that adherence to the three mile test by the court in this case was capricious and arbitrary. There was conflict among the experts on just what effect the variations from those conditions assumed in the equation would have on the depletion rate. Plaintiff's expert testified that the saturated beds in the aquifer are sloping and not isotropic, yet there was testimony before the court that recharge from untapped and upslope portions of the aquifer would move so slowly that it would not materially affect the depletion rate anticipated within the three mile circle. Also, the effect of pumping by wells within the

circle and elsewhere could reverse the flow of ground water caused by the slope. In fact, recent measurements in test wells close to the plaintiff's proposed well site indicated that draw down of water by existing wells was much as anticipated by the three mile test.

Experts called by the commission testified that the assumptions made by the three mile test as to the thickness and homogeneity of the aquifer indicated a larger reservoir of water in the aquifer than if assumptions urged by the plaintiff were adopted. The best evidence according to the plaintiff was that the aquifer was only 79-120 feet thick and that it was interspersed with impermeable layers of clay and rock. Neither condition necessarily benefits the plaintiff because either could mean that there is less water in the aquifer available for appropriation than assumed by the court.

There was evidence that the semi-artesian condition claimed to exist by plaintiff's expert would, if present, cause abnormally high readings in the test wells used to measure the declining water balance. Finally, it was admitted on both sides that the commission is dealing in a complex area about which little is known. Experts testifying for the commission stated that the three mile test is the best tool they presently have to work with, and that it will be refined as they continue to learn more about the area.

The plaintiff's application did not present the court with a close question of whether the granting of a new permit would work unreasonable injury to existing wells. According to the three mile test, seventeen wells in three mile circle pumping intermittently with a 1,000 gallon capacity per minute would deplete the water resource 40% in 25 years. There were 28 registered wells within the three mile circle encompassing the plaintiff's proposed well site. These 28 wells had a registered yield of 29,700 gallons per minute while the maximum yield allowable under the three mile test would be 17,000 gallons per minute.

■ The plaintiff pointed out to the court that the registered yield of existing wells within the circle on file with the commission may well be exaggerated and not truly represent the actual yield of the wells. However, the plaintiff did not offer more reliable information upon which the actual yield could be computed. Mr. Erker testified that he had checked the actual location of each of the wells within the three mile circle, and that it was his opinion that the majority of the wells within the circle produced approximately the amount of water claimed by the applicant on the registration. The trial judge took it into account that actual pumping from the existing wells might be less than the amount listed on the registration, and that five of the wells were located on the periphery of the circle. We conclude that the determination by the court that the plaintiff's proposed well would unreasonably impair existing water rights from the same source is adequately supported by the evidence in the record.

II.

■ The plaintiff calls our attention to Article XVI, Section 6 of the Colorado Constitution which provides: "The right to divert the unappropriated waters of any natural stream to beneficial uses shall never be denied." We find, however, that the record clearly supports the finding that there is no unappropriated water within the three mile circle surrounding the plaintiff's proposed well site.

■ Ground water existing in designated underground water basins is made subject to the doctrine of prior appropriation by 1965 Perm. Supp., C.R.S. 1963, 148-18-1. The statute further provides:

"* * * While the doctrine of prior appropriation is recognized, such doctrine should be modified to permit the full economic development of designated ground water resources. Prior appropriations of ground water should be protected and reasonable ground water pumping levels

maintained, but not to include the maintenance of historical water levels. * * *"

██ Underground water basins require management that is different from the management of surface streams and underground waters tributary to such streams. In the case of the latter waters, seasonal regulation of diversion by junior appropriators can effectively protect the interests of more senior appropriators and no long range harm can come of overappropriations since the streams are subject to seasonal recharge. The underground water dealt with by 148-18-1 is not subject to the same ready replenishment enjoyed by surface streams and tributary ground water. It is possible for water to be withdrawn from the aquifer in a rate in excess of the annual recharge creating what is called a mining condition. Unless the rate of pumping is regulated, mining must ultimately result in lowering the water balance below a level from which water may be economically withdrawn. Due to the slow rate at which underground waters flow through and into the aquifer, it may be many years before a reasonable water level may be restored to a mined aquifer.

It is clear that the policies of protecting senior appropriators and maintaining reasonable ground water pumping levels set forth by the underground water act require management which takes into account the long range effects of intermittent pumping in the aquifer. In this case all of the experts testifying before the commission and the district court were in agreement that a mining condition exists in the Northern High Plains Designated Ground Water Basin. The commission has determined that proper use of the ground water resource requires that the mining be allowed to continue. However, the maximum allowable rate of depletion, at least when considering applications for permits to drill new wells, has been set at 40% depletion in 25 years. We have pointed out that the depletion rate in the area which would be affected by the plaintiff's proposed well is in excess of

the rate allowed by the commission and approved by the district court.

If the plaintiff were permitted to proceed on his theory of "unappropriated water" and pump water from his proposed well until such time as it was no longer economically feasible to withdraw water from the aquifer, then no subsequent regulation of his pumping could protect senior appropriators, and all pumping from the basin within the area of influence of the plaintiff's well would have to cease until a reasonable pumping level was restored through the slow process of recharge. This is not the concept of appropriation contained in the statute, and not the one this Court will follow.

██ When, as in this case, water is being mined from the ground water basin, and a proposed appropriation would result in unreasonable harm to senior appropriators, then a determination that there is no water available for appropriation is justified.

III.

Finally, the plaintiff argues that the three mile test upon which the commission and the district court relied was adopted by the commission in violation of the provisions of the Administrative Code and cannot be enforced.

██ The function of this Court is not to review the decision of the commission, but to review the judgment of the district court handed down in the trial de novo. The provisions of Article 16 of the Administrative Code do not apply to the judicial branch of government. C.R.S. 1963, 3-16-1(1)(b). It is beyond the scope of this review to question whether the commission, in its denial of the plaintiff's application, used the three mile test as an administrative rule or as a tool with which to resolve the facts.

The district court characterized the three mile test as a general finding of fact based partly on data and expert opinion and partly on policy as an index or yardstick to compute the effect of a given well on the water

level and existing ground water users from a common source of supply. The trial judge found that it was reasonable to use a 25 year period and set a depletion rate of ground water resources at 40% over that period of time. He further found that an area of influence of 3 miles was reasonable when considering the plaintiff's application. He found that 40% depletion of the three mile area within 25 years would support pumping of no more than 17,000 gallons per minute. He resolved questions which were subject to conflicting expert testimony in favor of the commission. We have held that the findings of fact and conclusions of law by the trial judge are supported by the record. The trial judge used the three mile test as a matter of fact and policy in determining whether, in this particular case, a permit could be granted to the plaintiff under the terms of the statute.

The language of this Court in *Fellhauer v. People,* 167 Colo. 320, 447 P.2d 986 to the effect that wells in the Arkansas Valley could be regulated only in compliance with reasonable rules, regulations, standards and a plan established by the state engineer prior to the issuance of the regulative orders pertained to the duty of the state engineer to administer surface water and underground water tributary thereto under 1965 Perm. Supp., C.R.S. 1963, 148-11-22. In this case we are concerned with the management of underground water in designated ground water basins under 1965 Perm. Supp., C.R.S. 1963, 148-18-1 *et seq.* Our interpretation of the statutory requirements in *Fellhauer* does not apply here. The judgment of the district court is in accordance with the requirements of the appropriate statute and effectuates the policies of ground water management expressed in that statute.

The judgment is affirmed.