STATE ENGINEER and Division Engineer for Water Division No. 1, Opposers–Appellants,

v.

CASTLE MEADOWS, INC., Applicant–Appellee,

and

City of Englewood; Sanford Homes; Castleton Center Water and Sanitation District; Ferris F. Hamilton Revocable Trust; Bellemah Community Development Company; Atchison, Topeka and Santa Fe Railway Company; Mission Viejo Company; Highlands Ranch Development Corporation; Castle Pines Land Company; Castle Pines Metropolitan District; Castle Pines North Metropolitan District; C.P. Commercial Properties, Inc.; and Parker Water and Sanitation District, Opposers–Appellees.

STATE ENGINEER and Division Engineer for Water Division No. 1, Opposers–Appellants,

v.

CASTLE PINES METROPOLITAN DISTRICT; Castle Pines Land Company; the Friedkin Companies; and Friedkin Investments, Inc., Applicants–Appellees,

and

City of Englewood and Centennial Water and Sanitation District, Opposers–Appellees.

Nos. 92SA163, 92SA164.

Supreme Court of Colorado, En Banc.

July 12, 1993.

Rehearing Denied Aug. 23, 1993.

Gale A. Norton, Atty. Gen., Raymond T. Slaughter, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., Patricia S. Bangert, Deputy Atty. Gen., Jennifer L. Gimbel, First Asst. Atty. Gen., Bradley W. Cameron, and Peter A. Fahmy, Asst. Attys. Gen., Denver, for opposers-appellants.

Saunders, Snyder, Ross & Dickson, P.C., Holly I. Holder, Denver, for applicant-appellee and Castle Pines Metropolitan Dist.

Moses, Wittemyer, Harrison and Woodruff, P.C., Charles N. Woodruff, Veronica A. Sperling and Steven P. Jeffers, Boulder, for opposers-appellees Mission Viejo Co., Highlands Ranch Development Corp., and Centennial Water and Sanitation Dist.

Krassa, Lindholm, Kumli & Madsen, Robert F.T. Krassa, Boulder, for opposer-appellee Parker Water and Sanitation Dist.

No appearance for the following opposers-appellees: City of Englewood, Sanford Homes, Castleton Center Water and Sanitation Dist., Ferris F. Hamilton Revocable Trust, Bellemah Community Development, Atchison, Topeka and Santa Fe Railway Co., Castle Pines Land Co., Castle Pines Metropolitan Dist., Castle Pines North Metropolitan Dist. and C.P. Commercial Properties, Inc.

Sherman & Howard, Gary L. Greer, Denver, for applicant-appellee Castle Pines Land Co.

Petrock & Fendel, P.C., Frederick A. Fendel, III, Denver, for applicants-appellees the Friedkin Companies and Friedkin Investments, Inc.

JUSTICE LOHR delivered the Opinion of the Court.

In these consolidated cases,[1] the State Engineer and the Division Engineer for Water Division No. 1 (collectively, state engineer) appeal those portions of judgments of the District Court for Water Division No. 1 approving plans for augmentation proposed by the applicants in each case.[2] In Case Number 92SA163 the district court held an evidentiary hearing pursuant to our order of remand in *Danielson v. Castle Meadows, Inc.*, 791 P.2d 1106 (1990) (*Castle Meadows I*), to determine whether the pumping of not nontributary groundwater from the Denver aquifer by Castle Meadows, Inc. will result in post-withdrawal depletions in the South Platte River system that will injure others who hold water rights. In Case Number 92SA164 the district court held a trial pursuant to an application filed on behalf of Castle Pines Metropolitan District, Castle Pines Land Company, the Friedkin Companies, and Friedkin Investments, Inc. in which the parties sought a decree entitling them to withdraw Denver aquifer groundwater and approving an augmentation plan in the event that this water was determined to be not nontributary. Because both cases raised the issue of whether other water rights will be injured by post-withdrawal stream depletions that will result from the applicants' pumping of Denver aquifer groundwater, the district court entered a single Memorandum of Decision and Order in which it determined that no such injury will result and then entered judgments in each case approving the applicants' proposed plans for augmentation. Because we conclude that the district court erred when it considered evidence of additional water that will become available in the form of runoff as a result of increased development of the surrounding land areas in making its determinations, we reverse its judgments in part and remand the cases to that court to reconsider under the principles we now set forth whether the applicants' pumping of their decreed amounts of water will cause post-withdrawal depletions to the surface stream system that will injure holders of water rights.

I

A

The first case that we consider arose when Castle Meadows, Inc. (Castle Meadows)[3] sought water rights to Denver Ba-

---

1. These cases were separately tried and decided. We ordered them consolidated for purposes of briefing and argument only.

2. We have jurisdiction over these cases by virtue of Colo. Const. art VI, § 2, and of § 13–4–102(1)(d), 6A C.R.S. (1987), which statutorily excludes from the court of appeals' jurisdiction appeals from final judgments of district courts in "[w]ater cases involving priorities or adjudications." *See also* C.A.R. 1(a)(2).

3. The action was instituted by Lincoln Savings and Loan Association, Castle Meadows' predecessor in interest. For convenience, however, we will refer to Castle Meadows as the relevant party in this case.

On June 13, 1990, Parker Water and Sanitation District (Parker) filed a motion with the district court seeking to intervene in the action

sin[4] ground water to provide service to The Meadows Development, a planned community located near Castle Rock, Colorado. The specific right now at issue is based on a decree that Castle Meadows obtained in April of 1987, entitling it to make annual withdrawals of 2,990 acre-feet of ground water through its Denver aquifer wells. The decree established that this water is "not nontributary"[5] ground water and that the overlying property is located more than one mile from any point of contact between the Denver aquifer and any natural stream. Thus, pursuant to section 37–90–137(9)(c), 15 C.R.S. (1990),[6] the decree provided that as a condition to the right to use this ground water Castle Meadows was required to obtain judicial approval of a plan for augmentation ensuring the replacement of four percent of the amounts withdrawn annually.

Consequently, in October of 1986, Castle Meadows filed an application in the district court seeking approval of such a plan. It proposed several means of satisfying the four percent replacement obligation, including use of direct discharges from the development's wastewater treatment plant, taking credit for return flows that result from irrigation of the overlying property, and use of direct discharges of nontributary and not nontributary ground water from various wells. The district court determined that Castle Meadows' plan was sufficient to meet its obligation under section 37–90–137(9)(c) to return to the natural stream system four percent of the amounts that are withdrawn annually. This augmentation plan, however, extended only to those years that water is actually pumped from the wells. Although the court found that Castle Meadows' withdrawals will have "some continuing depletive effect on the tributary stream system after 100 years,"[7] it did not require that water be

or in the alternative to appear as amicus curiae. It also submitted a Statement of Opposition contesting the terms and conditions proposed by the opposers to Castle Meadows' application. The court accepted this statement and, on August 13, 1990, granted Parker leave to intervene in the proceedings. On appeal, Parker supported the position of the applicants in these cases and filed a brief in response to the state engineer concurring with the arguments presented by the applicants. Parker will therefore be included in our references to the applicants.

4. The Denver Basin is composed of four different aquifers, the Dawson, Denver, Arapahoe, and Laramie–Fox Hills. Withdrawals of ground water from these aquifers is governed by § 37–90–137, 15 C.R.S. (1990 & 1992 Supp.).

5. "Nontributary groundwater" is defined in § 37–90–103(10.5), 15 C.R.S. (1990), to mean

that ground water, located outside the boundaries of any designated ground water basins in existence on January 1, 1985, the withdrawal of which will not, within one hundred years, deplete the flow of a natural stream ... at an annual rate greater than one-tenth of one percent of the annual rate of withdrawal.

Although there is no legislative definition of "not nontributary groundwater," that phrase is used in § 37–90–137(9)(c), 15 C.R.S. (1990), the statutory provision that requires judicially approved plans for augmentation to be included in decrees for withdrawing from the four Denver Basin aquifers ground water that does not meet the legislature's definition of nontributary. The statutes governing the withdrawal of ground water that is nontributary do not impose this augmentation requirement upon applicants who seek to withdraw such water. *See* §§ 37–90–137(1), (2), (4), (6); 37–92–305(11), 15 C.R.S. (1990 & 1992 Supp.).

6. In pertinent part, § 37–90–137(9)(c) provides that

[a]s to wells which will be completed in the Dawson, Denver, Arapahoe, and Laramie–Fox Hills aquifers and will withdraw ground water which is not nontributary groundwater, as defined in section 37–90–103(10.5), judicial approval of plans for augmentation shall be required prior to the use of such ground water.... As to such wells completed in the Denver, Arapahoe, or Laramie–Fox Hills aquifers more than one mile from any point of contact between any natural stream including its alluvium on which water rights would be injuriously affected by any stream depletion, and any such aquifer, such decrees shall provide for the replacement to the affected stream system or systems of a total amount of water equal to four percent of the amount of water withdrawn on an annual basis.... Such decrees may also require the continuation of replacement after withdrawal ceases if necessary to compensate for injurious stream depletions caused by prior withdrawals from such wells and shall meet all other statutory criteria for such plans.

7. In determining the amount of water that may be decreed for annual withdrawal, an aquifer life of 100 years is assumed. § 37–90–137(4)(b)(I), (6), 15 C.R.S. (1990 & 1992 Supp.).

replaced after withdrawals from the wells cease—the post-withdrawal period. The court therefore approved Castle Meadows' plan for augmentation, and because its approval satisfied the condition in the April 1987 decree, on December 29, 1988, entered a final judgment and decree entitling Castle Meadows to withdraw 2,990 acre-feet of Denver aquifer groundwater annually.

The state, engineer appealed that judgment, contending that Castle Meadows' plan for augmentation did not satisfy section 37–90–137(9)(c). Arguing that the last sentence of that statute, see supra note 6, requires that compensation be made for depletions accruing to a stream after ground water withdrawals cease, the state engineer asserted that Castle Meadows' failure to provide for such post-pumping replacements rendered its plan for augmentation inadequate. We agreed with the state engineer and therefore held in *Castle Meadows I* that

> once a determination is made that injurious depletions to vested water rights, caused by withdrawal of not nontributary ground water from the Dawson, Denver, Arapahoe and Laramie–Fox Hills aquifers, occur after pumping ceases, section 37–90–137(9)(c) mandates that a plan for augmentation replace such depletions.

791 P.2d at 1113–14. Because the district court had found that post-withdrawal depletions would accrue to the stream but "did not find such depletions to be injurious" to other water rights, we remanded the case for the court to consider whether Castle Meadows' pumping will cause such injury and, if so, to impose terms and conditions on its plan for augmentation to alleviate that injury. *Id.* at 1114.[8]

On remand, the district court held an evidentiary hearing in which several experts testified as to the projected post-withdrawal stream depletions. Based on the evidence presented at the hearing the court again concluded that depletions will accrue to the stream after Castle Meadows ceases its withdrawals. As set forth in its ruling, contained in its February 27, 1992, Supplemental Findings of Fact, Conclusions of Law, Judgment and Decree, the court found that the preponderance of the evidence is that the total depletions "will not be less that 8.7 acre-feet [per year] nor more that 27.2 acre-feet [per year]."[9] It determined, however, that the depletions will not be injurious. In reaching this conclusion, the court considered the impact that increased development and urbanization of the surrounding land areas will have on the amounts of water available to the stream in the form of runoff. It stated that

> [t]he pumping involved here is in connection with municipal-type development in the Castle Rock area. There will be additional impermeable pavement and roof area, different types of vegetation present, and other changes which will increase the returns to the surface stream. The preponderance of the evidence is that the additional returns to the stream caused by urbanization will be greater than the depletions due to pumping after 100 years.[10]

8. We issued an initial opinion on April 23, 1990, in which we concluded that the depletions caused by Castle Meadows' exercise of its rights to the not nontributary ground water in the Denver aquifer will be injurious to water rights and therefore remanded the case for the water court to impose terms and conditions to prevent this injury. On May 29, 1990, we modified that opinion to its present form, leaving for the trial court to determine from the evidence whether post-withdrawal stream depletions will be injurious. The state engineer then filed a petition for rehearing asking us to review our modification and to hold as a matter of law that such injury will occur. On June 13, 1990, that petition was denied and stricken.

9. An expert for Castle Meadows predicted that after the end of 100 years of continuous pumping there will be a reduction of 27.2 acre-feet per year in the South Platte stream system. In contrast, the state engineer's expert testified that Castle Meadows' withdrawals will result in post-withdrawal stream depletions of approximately 8 acre-feet per year.

10. The "returns to the surface stream" represent water from sources other than the Denver aquifer wells at issue here, for the period of time under consideration is that following cessation of pumping from those wells.

After offsetting the increased runoff that is to result from the area's development against the amounts of post-withdrawal stream depletions expected to accrue to the stream by virtue of Castle Meadows' pumping, the court concluded that the projected depletions will not be injurious and that Castle Meadows' plan for augmentation satisfied section 37–90–137(9)(c). The court therefore reconfirmed its December 29, 1988, judgment as so supplemented.

### B

In the second of these consolidated cases, Castle Pines Metropolitan District and Castle Pines Land Company (collectively, Castle Pines)[11] filed an application in December of 1985 to change certain water rights that it held under existing decrees and for a decree adjudicating its right to withdraw all previously undecreed ground water from the Denver aquifer underlying 2,508 acres of land in the Castle Rock area.[12] It sought use of this water for the primary purpose of meeting the needs of a proposed planned community development on the property. Although Castle Pines requested a determination that the water it wished to withdraw was nontributary ground water as defined in section 37–90–103(10.5), it proposed and sought approval of a plan for augmentation that provided for replacements to the stream system of four percent of its annual withdrawals in the event the court should determine the water to be not nontributary. Castle Pines proposed to satisfy its four percent replacement obligation with seepage waters produced from reservoirs and ponds located on or near the overlying property, direct discharges from a wastewater treatment plant and from wells producing ground water, and return flows from irrigation on or near the land.

After reviewing Castle Pines' application, see § 37–92–302(2), the state engineer[13] found that the ground water was not nontributary and that judicial approval of a plan for augmentation would be required before the water could be used. In the state engineer's view, in order to satisfy the requirements of section 37–90–137(9)(c), Castle Pines needed to ensure the replacement not only of four percent of the amounts to be withdrawn during those years it actually pumped ground water but also of the amounts by which the stream will be depleted after cessation of its withdrawals. As to this latter requirement, the state engineer sought a "dedication of a quantity of water from an identified renewable water supply source sufficient to replace the maximum annual post-pumping depletive effect" caused by Castle Pines' withdrawals.

On July 10, 1991, the parties went to trial to resolve the issues of whether the subject groundwater was nontributary or not nontributary, whether Castle Pines' withdrawals would result in injurious post-withdrawal stream depletions, and if so, what type of water rights Castle Pines could use to satisfy the augmentation requirements contained in section 37–90–137(9)(c). In the single Memorandum of Decision and Order issued for both the Castle Meadows and the Castle Pines cases, the district court found that the water Castle Pines sought a right to withdraw was not nontributary groundwater. It therefore held that section 37–90–137(9)(c) required an augmentation plan providing for stream replacements in the amount of four percent of its annual withdrawals. The court also found

**11.** On May 9, 1991, the Resolution Trust Corporation (RTC) filed a motion to intervene in the proceedings as a co-applicant based on its assertion that it had an interest in the water rights pursuant to the terms of a deed of trust that was then in the process of foreclosure. The Friedkin Companies and Friedkin Investments, Inc. (collectively, Friedkin) later succeeded to RTC's interest and also acquired an additional interest from Castle Pines Land Company. In a July 3, 1991, order the district court allowed Friedkin to intervene in the action as a co-applicant. For convenience we refer to the applicants in this case collectively as Castle Pines.

**12.** Castle Pines initially claimed ownership of, or a right to appropriate, ground water underlying 2,656 acres of land but before trial reduced this to 2,508 acres and asserted a right to withdraw groundwater based on that area.

**13.** As used in this paragraph, the term "state engineer" does not include the Division Engineer for Water Division No. 1.

that Castle Pines' pumping would result in maximum post-withdrawal stream depletions of 15.9 acre-feet per year "up to and after 400 years." However, it concluded that these depletions would not be injurious, stating:

> [T]he pumping involved in this case is in connection with the urbanization of certain lands in the Castle Rock area. The preponderance of the evidence is, and the court finds, that the increase in returns to the surface stream caused by such urbanization will substantially exceed the depletions in the post-pumping period.

Thus, as in Castle Meadows' case, the court's finding of noninjury was based on its offset of the amounts of increased runoff attributable to projected development of the area against the projected post-withdrawal stream depletions. Thereafter, on February 27, 1992, the court issued its Findings of Fact, Conclusions of Law, Judgment and Decree, which included a holding that Castle Pines was not required to augment the stream system after withdrawals cease and that it would satisfy its statutory obligation by replacing four percent of its annual withdrawals during the years in which water is withdrawn through the wells. Finding Castle Pines' proposed plan for augmentation sufficient to meet this requirement, the court confirmed Castle Pines' right to withdraw 753.7 acre-feet of ground water per year from the Denver aquifer underlying its property.

### C

On appeal, the state engineer urges two grounds for reversal. First, the state engineer contests the water court's approval of the augmentation plans in each case, arguing that the plans do not contain adequate terms and conditions for ensuring the replacement of injurious post-withdrawal stream depletions. Specifically, the state engineer asserts that the district court erred by basing its conclusion that post-withdrawal stream depletions will not be injurious on the replacement of projected depletions by increases in runoff that are anticipated to accrue to the stream as the overlying lands are developed and increas-

ing areas of the surface become impermeable. As a second ground for reversal, the state engineer argues that as a matter of law these stream depletions will be injurious to other water rights or, in the alternative, that the district court has already implicitly ruled that if urban runoff cannot be considered, injury will result. In order to compensate for the asserted injurious effect in the post-withdrawal period, the state engineer urges us to require the applicants to provide means of guaranteeing adequate replacements to prevent such injury before they can put their decreed water rights to use. We address each ground for reversal in turn.

### II

### A

■ The state engineer challenges the district court's determination in each case that the post-withdrawal stream depletions that will result from the applicants' pumping of their decreed amounts of ground water from the Denver aquifer will not injure those who hold other water rights. Arguing that the pumping will have an injurious effect in the post-withdrawal period, the state engineer contends that the failure of the applicants' augmentation plans to ensure adequate replacements to the streams to prevent such injury precludes the judicial approval of the plans that section 37–90–137(9)(c) requires. The state engineer's argument is premised on the assertion that when the district court considered whether injury will occur, it improperly offset the projected stream depletions by the amounts of water that will become available as the overlying lands are developed and increased surface areas are made impermeable. The state engineer argues that the court's consideration of this factor contravenes the definition of a plan for augmentation as set forth in section 37–92–103(9). We agree that the court erred when it considered this factor in making its determination that the applicants need not include means of compensating for post-withdrawal stream depletions in their plans for augmentation. For that reason, we reverse the February 27, 1992,

judgments confirming Castle Meadows' December 29, 1988, decree and confirming Castle Pines' right to 753.7 acre-feet per year of Denver aquifer ground water and remand the cases to the district court for the limited purpose of reconsidering the issues of injury to other water rights and the provisions to be included in the augmentation plans to prevent any such injury.[14]

Under the Water Right Determination and Administration Act of 1969, sections 37-92-101 to -602, 15 C.R.S. (1990 & 1992 Supp.), a plan for augmentation was originally defined as

a detailed program to increase the supply of water available for beneficial use in a division or portion thereof by the development of new or alternate means or points of diversion, by a pooling of water resources, by water exchange projects, by providing substitute supplies of water, by the development of new sources of water or by any other appropriate means.

Ch. 373, sec. 1, § 148-21-3(12), 1969 Colo. Sess.Laws 1200, 1202 (now codified as amended at section 37-92-103(9)). In 1975, the legislature amended that statute by adding that a plan for augmentation

does not include the salvage of tributary waters by the eradication of phreatophytes, nor does it include *the use of tributary water collected from land surfaces which have been made impermeable,*[15] thereby increasing the runoff but not adding to the existing supply of tributary water.

Ch. 315, sec. 1, § 37-92-103(9), 1975 Colo. Sess.Laws 1397, 1397 (emphasis added). The parties do not dispute that the statute in its amended form precludes use of runoff that results from the urbanization of land areas as a source of supply water for

an augmentation plan. They disagree, however, as to the nature of the district court's rulings and whether the present cases implicate this statutory provision.

The state engineer contends that when the district court considered the impact that increased runoff attributable to overlying land development will have on the amount of water available to the stream system, it improperly compressed into a single inquiry the independent questions of whether injury will result and whether injury will be compensated for through stream replacements. Arguing that the court actually addressed the adequacy of an augmentation plan and therefore exceeded the purpose of the hearings, which was only to determine whether post-withdrawal stream depletions would, in themselves, injure other water rights, the state engineer asserts that the court undermined the statutory provision precluding urban runoff from serving as a source of augmentation.

The applicants disagree that the district court's ruling implicitly evaluates a plan for augmentation so that its consideration of the increases in urban runoff contravened section 37-92-103(9). In contrast, they assert that the court appropriately considered this runoff as a factor in determining the net impact that the use of their decreed amounts of water will have on the stream system. Relying on section 37-92-305(8), which requires that in reviewing a proposed augmentation plan and determining what terms and conditions may be necessary to prevent injury, a water judge must consider "the depletions from an applicant's use or proposed use of water," they contend that the court properly assessed not only the effects of their ground water withdrawals but also the impact that *use* of this water will have on the stream. Specifically, they liken the runoff to a re-

---

**14.** Our focus on whether injury will result to "water rights" or holders of "water rights" derives from § 37-90-137(9)(c), which uses that phrase for the purpose of determining whether a decree must contain a plan for augmentation. *See supra* note 6.

**15.** For purposes of this opinion, we assume from the parties' use of the terms "runoff" and "urban runoff" in their briefs and arguments on appeal as well as from the order of the district court that these terms were meant to refer to tributary waters capable of being collected be-

turn flow[16] that once diverted from a stream makes its way back to the system, and assert that the runoff reduces the consumptive use of the withdrawn water and therefore must be taken into account in assessing whether senior rights will be injured. *See Cache La Poudre Water Users Ass'n v. Glacier View Meadows,* 191 Colo. 53, 56, 62, 550 P.2d 288, 290, 294 (1976) (land developers required only to provide augmentation plan to replace amounts of water consumptively used; augmentation not needed for diversions compensated by return flows); *Kelly Ranch v. Southeastern Colo. Water Conservancy Dist.,* 191 Colo. 65, 69, 75, 550 P.2d 297, 300, 304 (1976) (same). The final ruling entered in Castle Meadows' case supports the applicants' characterization. In rendering that decision the court stated:

> The court recognizes that in certain situations, particularly in connection[ ] with plans for augmentation, by specific statute the increases in flows due to eradication of phreatophytes and creation of impermeable land surfaces may not be recognized. § 37–92–103(9), C.R.S. These statutory provisions do not apply to the present case. *This case is not a plan for augmentation because it is not a detailed program to increase the supply of water available for beneficial use in a water [division].*

(Emphasis added.)

We need not engage in the semantic distinction that the parties wish us to make to resolve these cases and therefore decline to determine whether the projected increases in runoff that will result from the applicants' development of the surrounding land areas is actually a plan for augmentation or whether, analogous to a return flow, it is an incident of their proposed use of the water. Regardless of any characterization we would adopt, we believe that it would contravene the purpose of the 1975 amendment to section 37–92–103(9) to allow

stream depletions to be offset by these anticipated increases in runoff with the result of circumventing the applicants' obligations to compensate holders of water rights for injuries that would otherwise occur. So as to give effect to the clear purpose of that amendment to preclude urban runoff from serving as a source of augmentation, we hold that the district court erred when it considered this factor and therefore reverse its determinations that the applicants' withdrawals will not result in such injury.

■ It is a well settled principle of statutory construction that a court's primary objective is to ascertain and give effect to the purposes for which the General Assembly enacted a particular provision. *Dunlap v. Colorado Springs Cablevision, Inc.,* 829 P.2d 1286, 1292 (Colo.1992); *Matter of Estate of Royal,* 826 P.2d 1236, 1238 (Colo. 1992); *Castle Meadows I,* 791 P.2d at 1111. If the language of a statute is unclear, we may rely on several indicators, including the object that the legislature sought to obtain by its enactment, the circumstances under which it was adopted, and the consequences of a particular construction. Section 2–4–203(1)(a), (b), (e), 1B C.R.S. (1980); *Woodsmall v. Regional Transp. Dist.,* 800 P.2d 63, 67 (Colo.1990). We must also be mindful that when the General Assembly adopts legislation, it is presumed to be cognizant of judicial precedent relating to the subject matter under inquiry. *People ex rel. Danielson v. City of Thornton,* 775 P.2d 11, 19 n. 7 (Colo.1989); *People v. Green,* 734 P.2d 616, 621 (Colo.1987). Because we also presume that legislation is intended to have just and reasonable effects, we must construe statutes accordingly and apply them so as to ensure such results. § 2–4–201(1)(c); *Woodsmall,* 800 P.2d at 67; *Petition of S.O.,* 795 P.2d 254, 258 (Colo.1990).

---

cause of the creation of impermeable land surfaces.

**16.** The runoff in question is not return flow from the production of the applicants' Denver aquifer wells, nor do the applicants contend that it is. Their argument is that use of the water

from their wells will contribute to urbanization of the area which in turn will increase the amount of impermeable terrain and will cause increased runoff that will continue after pumping has ceased.

In section 37–92–102(1)(a), the legislature declared that

> it is the policy of this state to integrate the appropriation, use, and administration of underground water tributary to a stream with the use of surface water in such a way as to maximize the beneficial use of all of the waters of this state.

This statement accords with the principle enunciated in many of our previous cases that the waters of our state are such a scarce and valuable resource that they must be administered in ways that effectuate the goal of "maximum utilization," including use of as much underground water as possible. *See, e.g., Kelly Ranch,* 191 Colo. at 74, 550 P.2d at 304; *Hall v. Kuiper,* 181 Colo. 130, 135, 510 P.2d 329, 332 (1973); *Fellhauer v. People,* 167 Colo. 320, 336, 447 P.2d 986, 994 (1968). At the same time, however, our cases have always recognized that the sometimes countervailing interest of protection of vested rights must be given effect. *See, e.g., Danielson v. Kerbs AG., Inc.,* 646 P.2d 363, 370–72 (Colo.1982) (although ground water in designated basins is subject to a modified prior appropriation doctrine to permit the full economic development of the resource, prior appropriators must be protected and a change in the place of use of a water right will therefore be allowed only when it does not result in injury); *Fundingsland v. Colorado Ground Water Comm'n,* 171 Colo. 487, 496–97, 468 P.2d 835, 839–40 (1970) (denial of the right to appropriate ground water subject to the priority system is justified when that water is being mined from a ground water basin so that the proposed appropriation would result in unreasonable harm to senior rights). In adopting the Water Right Determination and Administration Act of 1969, the General Assembly expressly recognized the need to protect those who hold vested water rights and required that such rights be preserved under our current water system. *See* Ch. 373, sec. 1, § 148–21–2(2)(a), –(b), 1969 Colo.Sess.Laws 1200, 1200–01 (now codified at section 37–92–102(2)(a), –(b)) (providing for the protection and preservation of existing vested rights). Consequently, the goal of maximizing the use of our waters must sometimes yield to that interest.

Similarly, although we continue to uphold the principle of maximum utilization, we have recognized in our more recent decisions that not only must that goal sometimes yield to protect vested rights, but that it must also be implemented so as to ensure that water resources are utilized in harmony with the protection of other valuable state resources. We made this clear in *Southeastern Colo. Water Conservancy Dist. v. Shelton Farms, Inc.,* 187 Colo 181, 529 P.2d 1321 (1974), where we held that persons could not obtain water rights free from the priority system by clearing land of phreatophytes (water consuming plants), thereby making available to the stream water that the plants previously consumed. We expressed our concern that recognizing such rights would create an incentive for persons to eradicate vegetation, thereby maximizing utilization of water to the detriment of other resources, stating:

> We are not unmindful that the statute [§ 37–92–102(1)(a)] speaks of the policy of maximum beneficial and integrated use of surface and subsurface water. But efficacious use does not mean uplifting one natural resource to the detriment of another. The waters of Colorado belong to the people, but so does the land. There must be a balancing effect, and the elements of water and land must be used in harmony to the maximum *feasible* use of both.

*Id.* at 191, 529 P.2d at 1327. *See also R.J.A., Inc. v. Water Users Ass'n of Dist. No. 6,* 690 P.2d 823, 828–29 (Colo.1984) (affirming the denial of an application for a developed water right that entailed the alteration of natural land characteristics in a manner that involved various potential detrimental effects on soil, wildlife, and other resources, and stating that the policy of maximum utilization "must be implemented with a sensitivity to the effect on other resources"); *In re Rules and Regulations,* 674 P.2d 914, 935 (Colo.1984) (in adoption of rules and regulations by the state engineer, the policy of maximum utilization "does not

require a single-minded endeavor to squeeze every drop of water from [the source]" but rather must be implemented "with proper regard for all significant factors, including environmental and economic concerns").

The legislature responded to these policy concerns when it amended section 37–92–103(9) to prevent the removal of phreatophytes from constituting a plan for augmentation. *Giffen v. State of Colo.,* 690 P.2d 1244, 1248 (Colo.1984) (recognizing this 1975 amendment as stimulated by *Shelton Farms* ). The fact that this same amendment also prevents runoff water collected from land surfaces that have been made impermeable from serving as a source of augmentation can only mean that the legislature intended the analogous result of removing the incentive for persons to attempt to increase water supplies by replacing natural land conditions with impermeable surfaces. Not only do we find this purpose clear from the words of the statute itself, but we believe it is evident when the amendment is considered within the legislative and judicial background from which it arose.

Turning to the present cases, we acknowledge that the district court's consideration of the increases in water anticipated to accrue to the stream system as a result of the applicants' development of land areas may serve the goal of maximizing beneficial uses of the water and that we have generally approved of innovative means of increasing uses of water. *See Kelly Ranch,* 191 Colo. at 74–75, 550 P.2d at 304. However, allowing the applicants credit for this runoff, thereby eliminating their obligation under section 37–90–137(9)(c) to compensate holders of senior rights for injuries that may otherwise result from their withdrawals, would clearly undermine the purpose of the legislature's amendment to the definition of a plan for augmentation contained in section 37–92–103(9).[17] Because we must give effect to the countervailing interests that the legis-

lature sought to protect when it enacted this amendment, we hold that regardless of whether the district court treated the urban runoff as an incident of the applicants' use for purposes of determining whether their withdrawals will result in injurious stream depletions or whether it considered the runoff as part of the applicants' plans for augmentation, its consideration of this factor contravenes the intent of section 37–90–137(9)(c), and therefore cannot stand.

### B

 Even if we assumed, however, that the district court did not err in crediting the applicants with the increases in runoff projected to accrue as a result of the area's development, its judgment must be reversed on an alternate and independent basis. Specifically, whether the court's ruling is characterized as an approval of a plan for augmentation or as a determination of absence of injury, the court erred by failing to consider the relationship between the time replacement water will be needed and the time the runoff will be available. Under section 37–92–305(8),

In reviewing a proposed plan for augmentation and in considering terms and conditions which may be necessary to avoid injury, the referee or the water judge shall consider the depletions from an applicant's use or proposed use of water, in quantity and in time, the amount and timing of augmentation water which would be provided by the applicant, and the existence, if any, of injury to any owner of or persons entitled to use water under a vested water right or a decreed conditional water right. A plan for augmentation shall be sufficient to permit the continuation of diversions when curtailment would otherwise be required to meet a valid senior call for water, to the extent that the applicant shall provide replacement water necessary to meet the lawful requirements of

---

17. We recognize that increased runoff will be an incidental effect of urbanization, not the product of a development effort conducted with the purpose of achieving that result. § 37–92– 103(9) prohibits consideration of runoff without regard to the intent underlying the creation of impermeable surfaces.

a senior diverter *at the time and location and to the extent the senior would be deprived of his lawful entitlement* by the applicant's diversion.

(Emphasis added.) These considerations are relevant regardless of whether a court is assessing injury or whether it is evaluating the adequacy of an augmentation plan. Thus, in considering whether it is necessary for applicants to compensate vested rights for stream impacts a court must evaluate whether, in light of the proposed withdrawals, holders of other water rights will be protected from injury with respect to the amount of water they are entitled to receive and the location and time at which they are to receive it. *Weibert v. Rothe Bros., Inc.,* 200 Colo. 310, 318–19, 618 P.2d 1367, 1373 (1980) (because a plan for augmentation is to be evaluated by applying the same criterion as an application for change of water right, trial court should have allowed evidence of replacement water, including its amount and timing, that was to be made available); *Glacier View Meadows,* 191 Colo. at 61, 550 P.2d at 294 (senior users not injured where water diversion did not displace water " 'from the time and place of their need' ") (emphasis in original) (quoting *Shelton Farms,* 187 Colo. at 190, 529 P.2d at 1326). *See also* section 37–92–502(2)(a) (existence of "material injury" to senior rights triggering a duty of a division engineer to discontinue particular diversions "depends on all factors which will determine in each case the amount of water such discontinuance will make available to such senior priorities at the time and place of their need").

In the present cases, the district court's reliance on increased urban runoff to prevent injury to senior rights fails to account for the possibility that this runoff may not be available at the same times that vested rights may be injured by low surface flow in the stream. Specifically, Castle Meadows' own expert testified that the post-

withdrawal stream depletions at issue in these cases will accrue to the stream "on a year-round basis." However, because of the fluctuating and unpredictable nature of urban runoff, that water may not be available at the times that senior users are affected by the depletions. The district court's failure to consider this timing discrepancy renders inadequate its conclusion that the applicants' pumping of their decreed amounts of water from the aquifer will not be injurious after their withdrawals cease and therefore requires that its determination of absence of injury and its approval of the applicants' plans for augmentation be reversed.[18]

### III

Having determined that the district court erred in reaching its conclusion that the applicants' withdrawals will not cause post-withdrawal stream depletions injurious to other water rights, we now address the state engineer's assertions that these depletions will be injurious as a matter of law. The state engineer presents two alternative grounds on which it urges us to find as a matter of law that injury will result from the applicants' withdrawals. It argues first that the district court's undisputed determinations that the subject ground water is not nontributary, taken together with the factual findings of the court, conclusively establish that vested water rights will be injuriously affected. Second, the state engineer contends that the district court's rulings contain an implicit determination that injurious post-withdrawal depletions will occur if runoff from anticipated development cannot be considered as an offset. We are not persuaded by either argument and therefore remand the cases to the district court to consider again whether holders of water rights will be injuriously affected by post-withdrawal stream depletions.

---

**18.** Nor does the district court's ruling address whether holders of other water rights will be adequately protected in terms of the locations from which they are entitled to divert water. Because the state engineer suggests that the depletions will accrue to the stream at points above many of the senior diversions, on remand the court should evaluate whether there will be differences in where replacement water is made available and where it is needed and whether these differences will cause injury.

The state engineer has cited no cases, and we have discovered none, in which we have determined the existence of injury as a matter of law, and we decline to do so in the present cases. The issue of injurious effect is inherently fact specific and one for which we have always required factual findings. *See, e.g., In re Application for Water Rights,* 799 P.2d 33, 37–38 (Colo. 1990) (applicant for a change of water right bears burden of proving that proposed change will not result in injury; although water courts exercise broad authority to determine whether injury will result and to protect holders of vested water rights, where further findings are needed to clarify basis of court's imposition of a decree condition, case remanded for such findings); *Weibert,* 200 Colo. at 318–19, 618 P.2d at 1373 (requiring water court to consider "the facts and appropriate legal standards" in determining the adequacy of a plan for augmentation under section 37–92–305,[19] which requires approval of such a plan if it will not injuriously affect vested or decreed conditional water rights); *Hallenbeck v. Granby Ditch and Reservoir Co.,* 160 Colo. 555, 572–74, 420 P.2d 419, 427 (1966) (case remanded to trial court for factual determination of whether asserted injury will exist and whether specific plan can protect against such injury).

Furthermore, we implicitly rejected the state engineer's argument that as a matter of law the post-withdrawal depletions will be injurious to the stream when we decided *Castle Meadows I.* The opinion we originally issued in that case on April 23, 1990, adopted the state engineer's position and determined that the projected depletions caused by Castle Meadows' exercise of its water right will be injurious. After Castle Meadows challenged that conclusion in a petition for rehearing, we modified our original opinion to require the water court "to make a determination of injury" on remand. *Castle Meadows I,* 791 P.2d at 1115. Implicitly, this recognized that the question of whether post-pumping stream depletions will be injurious involves factual

determinations. Although the state engineer presents the following arguments to the contrary, they do not persuade us that we were in error and that the issue of injury can be resolved as a matter of law.

The state engineer argues first that the depletive effect that the applicants' withdrawals will have on the stream cannot be considered de minimis and must be deemed legally significant. Asserting then that the depletions will accrue to the already over-appropriated South Platte River system on a year-around basis and will therefore take place at times when senior rights are calling, the state engineer contends that the depletions will necessarily be injurious as a matter of law.

■ This argument fails, however, as there is no basis on which we could arrive at a conclusion as to the significance of the effect that post-withdrawal stream depletions will have on the stream. The state engineer would have us find that because the water the applicants seek to withdraw does not qualify as "nontributary groundwater" under section 37–90–103(10.5), by definition the withdrawal of that water will have a legally significant impact on the stream. That argument, however, rests on the erroneous assumption that the legislature codified in that statute a legal definition of injury. Section 37–90–103(10.5) defines nontributary groundwater as groundwater outside of certain designated groundwater basins "the withdrawal of which will not, within one hundred years, deplete the flow of a natural stream ... at an annual rate greater than one-tenth of one percent of the annual rate of withdrawal." Whether groundwater is nontributary therefore is not dependent upon the quantitative effect that a well has on a stream but rather upon the annual withdrawal rate and a measure of the relationship between that rate and the resulting stream depletions. Moreover, the state engineer incorrectly assumes that the withdrawal of not nontributary groundwater will, by definition, deplete the stream

**19.** Our conclusion that the existence of injury is in part a factual question is supported by § 37–92–305. Subsection (8) of that statute sets forth several criteria that are relevant in determining injury, criteria that are inherently specific to an applicant's proposal. *See supra,* at 506–507.

*in the post-pumping period* by more than one-tenth of one percent of the amount withdrawn. Because the statutory definition measures depletions only during the 100–year pumping period, it provides no indication of the extent of depletions that will accrue to a stream once pumping ceases. Consequently, section 37–90–103(10.5) is not a useful tool for evaluating the significance of the effect that stream depletions will have on vested rights and does not determine the injurious nature of a withdrawal.[20]

The state engineer argues further, however, that the annual post-pumping depletions as found by the district court are legally significant as a result of their size alone and that it follows that such depletions are injurious. It relies in large part upon *Danielson v. Jones*, 698 P.2d 240 (Colo.1985), wherein a district court granted an application for determination of a water right for a well withdrawing tributary water in the Gunnison River system based in part on the conclusion that the additional twenty acre-feet per year that the applicant sought to withdraw was "an infinites[i]mal quantity of water" and that other appropriators could not be adversely affected by its withdrawal. *See id.* at 249. We reversed that decision, concluding that an increase in pumping by this amount "cannot be considered legally insignificant" and that the court erred in assuming that senior rights would not be injured. *Id.* at 250. Contrary to the state engineer's argument, however, we did not rule that a loss of twenty acre-feet per year was, as a matter of law, injurious to senior rights. Rather, we held that the State had presented evidence that the loss would cause material injury to the Gunnison River system, which we characterized as overappropriated, and that the applicant failed to offer any evidence that material injury to senior water rights would not result. *Danielson* recognizes, therefore, that material injury to vested water rights of others requires factual determinations based on the evidence presented in a particular case. We are convinced that this approach is correct and remain unpersuaded that injury can be determined as a matter of law in the cases now before us.

In its second argument, the state engineer urges us to find in the district court's ruling an implicit determination that the projected stream depletions will be injurious to holders of senior rights if runoff from anticipated development cannot be considered as an offset. The state engineer contends that the court's findings that such injury will not occur were based solely on that offset, a factor that was improperly considered, *see supra* Part IIA, and that when evaluated without this factor the court's analysis shows that it found the depletions injurious. We disagree.

Our review of the district court's ruling does not reveal any implicit determination that injury would result were it not for the increases in urban runoff that are expected to accrue to the stream system. In *Castle Meadows I*, we recognized that the court had previously found that post-withdrawal stream depletions would occur but because it did not determine whether the depletions would be injurious, we remanded the case

**20.** The state engineer also assumes, incorrectly, that the judicial test developed before the legislature adopted the definition in section 37–90–103(10.5) to evaluate the tributary nature of groundwater was based on an assessment of the effects that withdrawals of water had on a stream. In *Kuiper v. Lundvall*, 187 Colo. 40, 44, 529 P.2d 1328, 1331 (1974), *cert. denied*, 421 U.S. 996, 95 S.Ct. 2391, 44 L.Ed.2d 663 (1975), we stated that "as to ... water taking over a century to reach the stream, the tributary character is *de minimis*" and that the slow flow of such groundwater rendered it nontributary. We later refined this test in *District 10 Water Users Assoc. v. Barnett*, 198 Colo. 291, 294, 599 P.2d 894, 896 (1979), and determined that whether groundwater was tributary depended not only on the length of time it would take the water to reach a stream if it were left undisturbed but also on how long it would take the stream to be affected by the pumping of that water. That test was designed to evaluate the tributary *character* of groundwater, that is, whether it had a significant or de minimis *connection* to a surface stream. Because it was based on the amount of time it would take before withdrawals of the water would be felt by a stream, rather than upon the extent of impact that the withdrawals would have, a classification of groundwater as nontributary, even under this judicial test, bears no relationship to whether its withdrawal would be injurious.

for "consideration of such evidence as may be necessary" to make that determination. 791 P.2d at 1114. The district court did just that and again found that stream depletions will occur but concluded that the preponderance of the evidence showed they will not be injurious. In so doing, the district court relied on the offset of urban runoff as a basis for its finding. However, there is nothing in the court's ruling to suggest that it considered whether the projected stream depletions will be injurious if the urban runoff is not to be taken into account. The record here, in contrast to *Danielson*, contains other evidence of absence of injury. It is for the district court to determine the relevant facts based on the evidence and, at least in the first instance, to resolve the issue of injury by applying applicable legal standards to those facts. We therefore reject the state engineer's second argument that the stream depletions caused by the applicants' withdrawals will be injurious as a matter of law. Because this is a question involving facts that must be determined by the district court, we remand these cases for that court to consider whether the evidence, exclusive of the amounts of urban runoff projected to result from the area's development, shows that the applicants' use of their decreed amounts of water will result in injury after their withdrawals cease. As we stated in *Castle Meadows I*,

> [i]f the [district] court finds the projected depletions to be injurious, it shall impose terms and conditions on the plan for augmentation to alleviate injury caused by [the] depletions.... If upon remand the [district] court is unable to make a determination as to whether the depletions will be injurious, it shall retain jurisdiction on the issue of injury caused by post-withdrawal depletions for such a time period as it deems appropriate....

791 P.2d at 1114.

## IV

We conclude that the district court erred in considering urban runoff expected to accrue to the stream system as a result of development of overlying land areas as a basis for finding that the applicants' pumping of their decreed amounts of groundwater from the Denver aquifer will not result in injurious post-withdrawal stream depletions. For that reason we reverse its findings of non-injury as well as the final judgments that it entered in each case approving the applicants' plans for augmentation and confirming their rights to withdraw the subject ground water. Furthermore, we decline to hold as a matter of law that the stream depletions will be injurious to other water rights and therefore remand these cases to the district court for determinations of whether such injury will result from the applicants' withdrawals and for any further proceedings necessitated by those determinations and consistent with this opinion.

MULLARKEY, J., concurs in part and dissents in part.

Justice MULLARKEY concurring in part and dissenting in part:

I concur with the majority that the applicants are precluded from using urban runoff as part of their augmentation plans to compensate for post-pumping depletions of not nontributary ground water from the Denver aquifer. I agree that section 37–92–103(9), 15 C.R.S. (1990), prohibits a plan for augmentation from including "the use of tributary waters collected from land surfaces which have been made impermeable, thereby increasing runoff but not adding to the existing supply of tributary water."

I do not join part IIB because I believe that we do not need to reach the issue of the timing of the runoff compared with the calls made by senior appropriators. The opinion holds that the water court erred in admitting evidence of runoff and that is dispositive. *See* Maj. op. at 498, 504, 506, 510. The question of timing is not an independent ground of decision because a favorable ruling on that issue could not result in a finding of no injury. In my view, the timing issue should not be addressed and part IIB of the majority is dictum. *Twilley v. Durkee*, 72 Colo. 444, 454, 211 P. 668, 671 (1922); *see also United*

*States v. Jesse,* 744 P.2d 491, 502–03 (Colo. 1987).

A timing question arises in this case because of what the majority describes as the "fluctuating and unpredictable nature" of urban runoff resulting from precipitation. Maj. op. at 507. The primary source of the runoff water included in the Castle Meadows and Castle Pines augmentation plans is water from rain and snow. As we know, precipitation in Colorado is infrequent and even nonexistent at times. This fact leads to what the majority calls a "timing discrepancy". Maj. op. at 507. Post-pumping depletions and the corresponding need for augmentation will occur one hundred or more years in the future.[1] The applicants' evidence does not correlate the times in the post-pumping era when rain will fall and accrue to the South Platte River basin with the times when senior water rights holders will make calls for South Platte River water. Accordingly, the majority finds, such precipitation water cannot be used to replace water that would otherwise be in the stream. But even if the applicants managed to solve the timing problem by, *e.g.,* impounding the water to make it available on demand, approval of the augmentation plans still would be denied because the water is runoff and statutorily cannot be used in an augmentation plan. Thus, I believe the timing discussion is fruitless.

In other cases, however, an applicant for a plan of augmentation attempting to prove non-injury first must quantify the amount, timing, and location of water accruing to a stream by proof that is more probable than not. Then, the applicant must show that this water will replace the applicant's out-of-priority draws from the stream. *See* Maj. op. at 506–507. If the water court finds that such showing has been made, and the water court's finding is supported by the evidence,[2] we should affirm the ruling. I must differ from the majority here because the language used in part IIB seems to invite objectors and water courts to demand an impossibly exact standard of proof to show non-injury.

For these reasons, I do not join in part IIB of the majority opinion.

---

**1.** Our first decision in this case noted evidence of post-pumping depletions for a period of two hundred years. *Danielson v. Castle Meadows, Inc.,* 791 P.2d 1106, 1114 (Colo.1990).

**2.** Here, neither Castle Pines nor Castle Meadows countered the State Engineer's arguments regarding the timing issue.